IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| State of Utah, | ) | OPINION |
| | ) | |
| Plaintiff and Appellee, | ) | Case No. 20090913-CA |
| | ) | |
| v. | ) | F I L E D |
| | ) | (March 1, 2012 ) |
| Robert Michael Sheehan, | ) | |
| | ) | 2012 UT App 62 |
| Defendant and Appellant. | ) | |

-----

Third District, Salt Lake Department, 061908535
The Honorable William W. Barrett

Attorneys:    Debra M. Nelson, Salt Lake City, for Appellant
             Mark L. Shurtleff and Christopher D. Ballard, Salt Lake City, for
             Appellee

-----

Before Judges Orme, Thorne, and Christiansen.

CHRISTIANSEN, Judge:

¶1     Defendant Robert Michael Sheehan challenges his jury convictions for
aggravated burglary, *see* Utah Code Ann. § 76-6-203 (2008), and aggravated assault, *see*
*id.* § 76-5-103 (current version at *id.* (Supp. 2011)).  Sheehan argues that the trial court
abused its discretion when it failed to hold a *Rimmasch* or rule 702 hearing to determine
whether to admit the State's expert testimony that a palm print found at the scene
matched Sheehan's palm print.  *See generally* Utah R. Evid. 702; *State v. Rimmasch*, 775
P.2d 388 (Utah 1989).  We affirm the trial court's decision in this matter.  Sheehan also
argues that the trial court erred by excluding his expert's testimony and limiting

Sheehan's cross-examination of the State's experts. We determine that the trial court erred in this regard, and therefore, we reverse and remand for a new trial.


BACKGROUND

¶2      On December 11, 2006, the victim was attacked and seriously injured in her house. When the police arrived, the victim claimed that her attacker was a co-worker whom she had invited into her house earlier that night and who was in her house at the time of the attack. Based on the evidence at the scene, the police eventually eliminated that individual as a suspect despite the victim's initial identification of him as the attacker. During the initial investigation, an officer asked the victim if Sheehan could have assaulted her. The victim responded in the negative. However, during subsequent interviews in the days following the attack, the victim began to implicate Sheehan.

¶3      The only evidence that allegedly tied Sheehan to the scene of the attack was part of a bloody palm print found on a pillow case from the victim's bed. Before trial, Sheehan filed a motion requesting a hearing pursuant to *State v. Rimmasch*, 775 P.2d 388 (Utah 1989), to challenge the reliability and admissibility of the State's print evidence.[1] Alternatively, he requested that the jury be instructed "that fingerprint identifications are opinions not facts and are not infallible." Also, in the alternative, Sheehan requested that "testimony of individualization" be excluded. Sheehan argued that

> [b]ecause the reliability and accuracy of fingerprint and palm print identification evidence can be reasonably questioned and ha[d] never been evaluated under the more stringent test now imposed upon novel scientific evidence, a *Rimmasch* hearing [wa]s necessary to determine the admissibility of the partial palm print identification evidence at issue in this case.

---

1. Defendant's arguments at the trial court and before this court do little to differentiate between fingerprint and palm print evidence. Thus, we often refer to it as "print evidence."

¶4     On July 2, 2008, the trial court conducted a hearing at which the parties argued about the necessity of a *Rimmasch* hearing. Sheehan attempted to present the testimony of Dr. Simon A. Cole to dispute the reliability of the State's proposed print evidence. The court concluded that, based on Utah law as established by *State v. Quintana*, 2004 UT App 418, 103 P.3d 168 (mem.), *cert. denied*, 123 P.3d 815 (Utah 2005), Sheehan was not entitled to a *Rimmasch* hearing to challenge the admissibility of the State's print evidence. Based on this conclusion, the court refused to allow Dr. Cole to testify at the hearing and did not allow the defense to make a record of Dr. Cole's testimony, even though Dr. Cole had traveled from California to attend the hearing. Nevertheless, the court indicated that it might allow Dr. Cole to testify at trial.

¶5     Sheehan subsequently filed a motion requesting the court's permission for Dr. Cole to testify at trial. Sheehan asserted that the court should allow him "to present [expert] testimony challenging both the reliability of the methods employed by the State's expert in reaching her conclusions and the reliability of palm print evidence generally." Sheehan argued that, pursuant to Utah Rule of Evidence 702, "[d]ue process [allowed] Sheehan to attack the State's direct evidence against him, including the reliability of the specific methods used to determine a 'match' of his palm print to a partial print found at the scene of the alleged crime."

¶6     On August 4, 2008, the court conducted a hearing on Sheehan's motion. During the hearing, Sheehan argued that it was "important that [he] have [his] own expert to come in and testify about the shortcomings of fingerprint identification," especially given the expected testimony from the State's expert that "there is a zero error rate" in making print identifications. Defense counsel stated, "[T]he [c]ourt determines admissibility, and ultimately the jury is going to decide the weight to give the evidence. We're not asking you to exclude the fingerprint evidence. We just want a fair chance to respond to the [State's] expert with our own expert." The State responded by arguing that *Quintana* established that fingerprint evidence was reliable and that Sheehan should not be allowed "to have a *Rimmasch* hearing during the trial [because] it circumvents [the court's] prior ruling." The State further addressed the procedure used by its expert to analyze prints and argued that, while that procedure could be challenged at trial, Sheehan was not "entitled to bring in a Ph.D. to talk about the fact that he studied this and there have been mistakes in the past." Finally, the State asserted that its expert was "not going to say that there is a zero error rate."

¶7    In denying Sheehan's motion, the court first addressed the weight of the evidence issue and stated that Sheehan could cross-examine the State's expert on whether mistakes can be made in fingerprint analysis.  Sheehan responded to this ruling by arguing that, although he could cross-examine the State's expert on her response that the error rate is zero, he needed his own expert and that he was "entitled to under Rule 702 to come in and say, well, that's just simply not true; that's simply not accurate."  In addressing the admissibility issue, the court once again relied on this court's decision in *Quintana* to exclude Dr. Cole's testimony.

¶8    Because the court excluded Dr. Cole's testimony, Sheehan's only option at trial was to attack the print evidence through cross-examination of the State's experts.  The State called two experts to testify at trial, Trenton Gary Grandy and Elisa Macken-Farmer.

¶9    Grandy, who worked at the Utah Bureau of Forensic Services (the State Crime Lab), initially processed and photographed the print taken from the victim's house, and then, after another State Crime Lab employee, Macken-Farmer, identified the print as matching Sheehan's print, Grandy verified it.  During cross-examination, Grandy admitted that he was a member of the International Association for Identification (IAI) and initially admitted that he was aware of IAI's recommendation that its members not assert a 100% infallibility or zero error rate when addressing the reliability of fingerprint comparisons.  However, the court, in response to the State's objection, limited defense counsel's questioning of Grandy to whether he was aware of the IAI recommendation and limited Grandy to a yes or no response.  When asked again, Grandy stated that he could not "really answer yes or no . . . because [he was] not sure exactly what [the IAI report meant] by zero error rate."  The court then stated, "Then let's stop . . . .  Get on to something else."  Defense counsel then asked Grandy if he was familiar with an organization called the Scientific Working Group on Friction Ridge Analysis, Study and Technology (SWGFAST), to which Grandy responded affirmatively.  Defense counsel continued, "Are you aware that they've reported that they acknowledge that errors do occur, and furthermore that claims of zero error rate in the discipline are not scientifically plausible?"  Grandy responded, "No, I'm not aware of that."  When defense counsel began the next question, the court interrupted by saying, "Wait a minute, don't argue with him.  He said he's not aware of it.  Leave it alone."  On redirect examination, the State then asked Grandy if he had ever erred in analyzing prints and making comparisons; Grandy responded, "To my knowledge, I've never made an error, no."

¶10    Following the limits the court imposed on Sheehan's cross-examination of Grandy and in anticipation of the court similarly limiting the defense during its cross-examination of Macken-Farmer, defense counsel asked the court, outside the jury's presence, to revisit its prior ruling that the defense could not introduce into evidence certain reports that questioned the reliability of print analysis. Defense counsel argued that by excluding the reports the court had "limited what [defense counsel was] able to say on the record" and limited "the exhibits that [defense counsel] intended to use . . . to cross examine." The court made clear that it was not going to revisit its prior ruling and was not going to allow the defense to introduce the reports.

¶11    With the jury still excused, defense counsel then proffered the evidence that would have been introduced during cross-examination had the court allowed it. Defense counsel discussed the 2009 report from the National Research Council (the NAS report) and stated that the NAS report

> specifically addresse[d] fingerprint analysis, fingerprint evidence and concerns about how testimony has been introduced and admitted in cases and talk[ed] about the zero error rate. It talk[ed] about subjectivity, the two items that Ms. Macken[-Farmer] had previously written a report about, and so [defense counsel] was going to use those sections to impeach her on those two issues.

Defense counsel also discussed the SWGFAST report dated August 3, 2009. This report addressed the "subjectivity . . . inherent in the [print analysis] process." The report also discussed that "the claim of zero error rate is not scientifically plausible" and gave examples of misidentification, such as the Brandon Mayfield case.[2] Defense counsel

---

2. Defense counsel referenced the well-publicized Brandon Mayfield case in which the Federal Bureau of Investigation (FBI) incorrectly determined that Mayfield's prints matched those found at a terrorist bomb scene in Madrid, Spain. *See* Simon A. Cole, *More Than Zero: Accounting for Error in Latent Fingerprint Identification*, 95 J. Crim. L. & Criminology 985, 985-86 (2005). "Mayfield, an Oregon attorney and Muslim convert[,] . . . was held for two weeks as a material witness in the Madrid bombing of March 11, 2004, a terrorist attack in which 191 people were killed," after a senior examiner at the

(continued...)

then discussed the IAI report dated February 19, 2009. The IAI report advised its members, which included both Grandy and Macken-Farmer, to "not assert 100% infallibility zero error rate when addressing the reliability of fingerprint comparison" and to "avoid stating their conclusions in absolute terms when dealing with population issues." Finally, defense counsel discussed a March 2006 document prepared by the Office of the Inspector General after reviewing the investigative techniques used in the Brandon Mayfield case. Defense counsel quoted this document, which questioned the accuracy of those "'[m]any latent fingerprint examiners [who] have previously claimed absolute certainty for their identifications and a zero error rate for their discipline.'" Defense counsel also argued that rule 803(18) of the Utah Rules of Evidence allowed the reports to be admitted into evidence.

¶12 When the jury returned, the State called Macken-Farmer from the State Crime Lab to offer expert testimony that the palm print found at the crime scene matched Sheehan's palm print. On cross-examination, Macken-Farmer acknowledged that she belonged to the IAI and that she was aware that IAI had issued a report that recommended that "its members not assert 100[%] infallibility or a zero error rate when talking about the reliability of print comparisons." In response to the State's objection, the court limited Macken-Farmer's response to whether or not she was aware of the report. Similar questions, objections, and limitations were placed upon defense counsel when questioning Macken-Farmer about the SWGFAST report. On redirect, Macken-Farmer testified that while there can be human error in fingerprint analysis, she had never made a bad identification. Macken-Farmer also explained, in response to the State's questions, the serious repercussions that might arise if an analyst made an incorrect identification and such a mistake was discovered, i.e., the analyst would be removed from all case work, have past analyses reexamined, and go through rigorous retraining and testing.

¶13 In addition to the palm print evidence, the State presented limited circumstantial evidence during its case-in-chief. The State presented evidence that several hours

---

2. (...continued)
FBI matched Mayfield's print with a latent print "found on a bag in Madrid containing detonators and explosives." *Id.* After the Spanish National Police matched the latent print with another individual living in Spain, "the FBI retracted the identification altogether and issued a rare apology to Mayfield." *Id.* at 986.

before the assault Sheehan called 911 to report the victim's vehicle being driven by someone who appeared intoxicated. Additionally, Sheehan and the victim had lived together from February to September 2005. The State also produced evidence that, when Sheehan's residence was searched, he possessed the victim's dress and two pairs of her underwear.

¶14 At the conclusion of the trial, the jury returned guilty verdicts for aggravated burglary, *see* Utah Code Ann. § 76-6-203 (2008), and aggravated assault, *see id.* § 76-5-103. Sheehan now appeals.

ISSUES AND STANDARDS OF REVIEW

¶15 Sheehan asserts that the trial court abused its discretion when it refused to conduct a *Rimmasch* hearing to determine whether the State's print evidence was admissible at trial.

> The trial court has wide discretion in determining the admissibility of expert testimony . . . . Accordingly, we disturb the district court's decision to [exclude] expert testimony only when it exceeds the limits of reasonability. Our review of the district court's exercise of its discretion include[s] review to ensure that no mistakes of law affected a lower court's use of its discretion. Thus, if the district court erred in interpreting Utah Rule of Evidence 702 when it [excluded the expert testimony], it did not act within the limits of reasonability, and we will not defer to the evidentiary decision.

*Eskelson v. Davis Hosp. & Med. Ctr.*, 2010 UT 59, ¶ 5, 242 P.3d 762 (omission and second alteration in original) (citations and internal quotation marks omitted).

¶16 In addition, Sheehan argues that the trial court violated his constitutional rights by excluding Dr. Cole's expert testimony. Whether a defendant's constitutional rights were violated "is a question of law, which we review for correctness." *See State v. Calliham*, 2002 UT 86, ¶ 42, 55 P.3d 573.

¶17     Finally, Sheehan argues that the trial court violated his constitutional rights by limiting his cross-examination of the State's experts.

> When reviewing a trial court's decision to limit cross-examination, we review the legal rule applied for correctness and the application of the rule to the facts of the case for an abuse of discretion. If an error does occur, we must determine "whether, assuming that the damaging potential of cross-examination [had been] fully realized," the error was nonetheless "harmless beyond a reasonable doubt."

*State v. Chavez*, 2002 UT App 9, ¶ 17, 41 P.3d 1137 (alteration in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)) (additional citation omitted); *see also State v. Marks*, 2011 UT App 262, ¶ 11, 262 P.3d 13, *cert. denied*, 20110898-SC (Utah Feb. 17, 2012). "Whether an evidentiary ruling violated a defendant's right of confrontation is a question of law that we review for correctness."[3] *State v. Hamblin*, 2010 UT App 239, ¶ 12, 239 P.3d 300, *cert. denied*, 245 P.3d 757 (Utah 2010).


ANALYSIS

## I. The Trial Court Did Not Abuse Its Discretion in Denying Sheehan's Request for a *Rimmasch* Hearing.

### A.  *Rimmasch* Compared to the Amended Rule 702 of the Utah Rules of Evidence

¶18     Without providing any meaningful analysis, Sheehan occasionally mentioned rule 702 of the Utah Rules of Evidence in his request for a *Rimmasch* hearing. Nevertheless, he focused on *Rimmasch*'s novel versus nonnovel determination, even though the amended rule 702 altered the procedure for the admission of expert testimony. *See* Utah R. Evid. 702 advisory committee note. Accordingly, we begin our

---

3. Because we reverse and remand for a new trial, we do not reach the remaining issue Sheehan raises on appeal—whether the trial court made a clerical error in determining the amount of Sheehan's restitution.

analysis by clarifying the differences and similarities between the *Rimmasch* test and the admissibility requirements pursuant to rule 702 of the Utah Rules of Evidence.

### 1. *Rimmasch* and the Prior Rule 702

¶19 Prior to the 2007 amendment, rule 702 stated only that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." *Id.* R. 702(a) & advisory committee note; *see also Eskelson*, 2010 UT 59, ¶ 10. The pre-2007 version of Utah's rule, which was identical to rule 702 of the Federal Rules of Evidence in effect at that time, required that if "expert testimony [was] based upon novel scientific principles or techniques, courts . . . imposed additional tests of admissibility," often referred to as the *Frye* or *Rimmasch* test. *See State v. Rimmasch*, 775 P.2d 388, 396 (Utah 1989). *See generally Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923), *superseded by rule as stated in Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587 (1993); *Eskelson*, 2010 UT 59, ¶ 10. Under this test, "'in addition to satisfying the traditional requirements of relevancy and helpfulness to the trier of fact, the proponent must show general acceptance of the principle or technique [upon which the testimony is based] in the scientific community.'" *Rimmasch*, 775 P.2d at 396 (alteration in original) (citation omitted). "[T]he purpose of a more restrictive test for judging the admissibility of scientific testimony [wa]s to assure, as a threshold matter, that the evidence [wa]s sufficiently reliable to go to the finder of fact." *Id.*

### 2. Utah's Rule 702 as Amended in 2007

¶20 When rule 702 of the Utah Rules of Evidence was amended in 2007, it "retain[ed] limited features of the traditional *Frye* [or *Rimmasch*] test" in section (c), which allowed for admission of expert testimony upon a "[t]hreshold showing" that "the principles or methods on which such knowledge is based . . . are generally accepted by the relevant legal expert community," *see* Utah R. Evid. 702(c) & advisory committee note; *Gunn Hill Dairy Props., LLC v. Los Angeles Dep't of Water & Power*, 2012 UT App 20, ¶ 30. "The concept of general acceptance as used in section (c) [was] intended to replace the novel vs. non-novel dichotomy that has served as a central analytical tool in Utah's Rule 702 jurisprudence." Utah R. Evid. 702 advisory committee note.

¶21    The 2007 amendment also added an additional method for establishing the reliability of expert testimony. *See id.* R. 702(b) & advisory committee note. "The failure to show general acceptance meriting admission under section (c) does not mean the evidence is inadmissible, only that the threshold showing for reliability under section (b) must be shown by other means." *Id.* R. 702 advisory committee note. Accordingly, "if the principles or methods . . . are [not] generally accepted by the relevant expert community," *id.* R. 702(c), then the proponent of the evidence must establish that "the scientific, technical, or other principles or methods underlying the testimony meet a threshold showing that they (i) are reliable, (ii) are based upon sufficient facts or data, and (iii) have been reliably applied to the facts of the case," *id.* R. 702(b).

¶22    Utah's rule 702 differs from its current federal counterpart by requiring "only a 'threshold' showing." *See id.* R. 702 advisory committee note.

> That "threshold" requires only a basic foundational showing of indicia or reliability for the testimony to be admissible, not that the opinion is indisputably correct. When the trial court, applying this amendment, rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable. The amendment is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise. Contrary and inconsistent opinions may simultaneously meet the threshold; it is for the factfinder to reconcile—or choose between—the different opinions.

*Id.*; *see also Gunn Hill Dairy Props., LLC*, 2012 UT App 20, ¶¶ 33, 47 (discussing the meaning of "threshold" and stating that "a trial court's consideration of whether expert testimony satisfies a 'threshold showing' of reliability marks only the *beginning* of a reliability determination [and i]t is up to the trier of fact to determine the ultimate reliability of the evidence" (citation omitted) and stating that "[t]he court's role is only preliminary; the factfinder bears the ultimate responsibility for evaluating the accuracy, reliability, and weight of the testimony"). With that background in mind, we turn to the facts of this case.

B. The Trial Court Did Not Abuse Its Discretion When It Denied Sheehan's Request for a *Rimmasch* Hearing.

¶23    On appeal, Sheehan argues that both the State and the trial court understood that his request for a *Rimmasch* hearing was for "the trial court to determine the accuracy and reliability of the print evidence given that recent studies have undermined its reliability."  However, in arguing about the admissibility of the print evidence pursuant to *Rimmasch*, Sheehan necessarily requested the trial court to focus on whether the State's print identification evidence was *novel* scientific evidence.  Because Sheehan requested that the trial court focus solely on the issue of novelty, the trial court correctly concluded that *State v. Quintana*, 2004 UT App 418, 103 P.3d 168 (mem.), *cert. denied*, 123 P.3d 815 (Utah 2005), was determinative.  The *Quintana* court was asked to determine if the *Rimmasch* standard should apply to expert testimony regarding fingerprint identification evidence because there was "lack of empirical research on fingerprint evidence." *See id.* ¶ 5.  The *Quintana* court "conclude[d] that fingerprint identification is not novel scientific evidence." *Id.*  Thus, given Sheehan's arguments to the trial court and the *Quintana* court's determination, the trial court's decision to admit the State's proposed expert testimony at trial was reasonable and correct.  Thus, the court did not abuse its discretion in refusing to hold a *Rimmasch* hearing to determine whether the State's proposed expert testimony was admissible. *See State v. Hamilton*, 827 P.2d 232, 236-37 (Utah 1992) (declining to treat fingerprint evidence according to a "more stringent standard"); *Quintana*, 2004 UT App 418, ¶ 6 (determining that based on *State v. Hamilton*, 827 P.2d 232 (Utah 1992), "and a longstanding reliance on fingerprint evidence, the trial court did not abuse its discretion when it admitted the fingerprint expert's testimony"); *see also Eskelson v. Davis Hosp. & Med. Ctr.*, 2010 UT 59, ¶ 5, 242 P.3d 762 (stating that the trial court is granted "'wide discretion in determining the admissibility of expert testimony'" (citation omitted)).

## II.  The Trial Court Erred in Excluding Sheehan's Expert and Limiting His Cross-Examination of the State's Experts.

¶24    In addition to challenging the admissibility of the State's expert testimony, Sheehan argues that the trial court violated his due process and confrontation rights when it excluded his expert from testifying and limited his cross-examination of the State's experts.  We agree.

A.  The Trial Court Erred in Excluding Sheehan's Expert.

¶25    The trial court did not allow Sheehan's expert to testify at trial because the trial court found determinative *Quintana's* holding that the scientific principles underlying fingerprint comparison meet the threshold foundational requirements for admission in Utah courts.  *See generally* 2004 UT App 418, ¶¶ 5-6.  However, as explained above, while the trial court acts as a gatekeeper to keep expert evidence that is not reliable from the fact finder, this threshold determination does not extend to exclude contradictory evidence.  While it is true that a fingerprint expert's testimony about a fingerprint identification is considered sufficiently reliable to allow such evidence to be presented to a jury pursuant to *Quintana*, *see id.* ¶ 6, and the trial court properly relied on this court's determination in *Quintana* to admit the State's expert testimony, *see supra* ¶ 23, such a determination does not automatically exclude any contradictory expert testimony from trial, as long as the competing expert qualifies under rule 702.  In fact, rule 702's advisory committee note states,

> When the trial court, applying this amendment, rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable.  The amendment is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise.  Contrary and inconsistent opinions may simultaneously meet the threshold; it is for the factfinder to reconcile—or choose between—the different opinions.

Utah R. Evid. 702 advisory committee note.  Thus, rule 702 requires a trial court to independently evaluate whether the proposed expert's testimony meets the reliability threshold requirements under rule 702, rather than excluding one expert's testimony simply because it contradicts another expert's testimony that has already met the reliability threshold requirements.  *See id.*

¶26    Because the trial court failed to independently evaluate whether Sheehan's expert's testimony was admissible under rule 702, the trial court misapplied rule 702 to

exclude Sheehan's expert.[4]  Instead, the court essentially determined that because the State's print evidence was reliable for admissibility purposes, any evidence offered to challenge the State's print evidence at trial was necessarily unreliable.  Consequently, the court's misapplication of the rule "'exceed[ed] the limits of reasonability.'"  *See Eskelson*, 2010 UT 59, ¶ 5 (citation omitted) ("[I]f the district court erred in interpreting Utah Rule of Evidence 702 when it [excluded the expert], it did not act within the limits of reasonability, and we will not defer to the evidentiary decision.").

¶27    Some of the trial court's confusion seemed to be based on its acceptance of the State's argument that the court alone determines whether expert testimony is reliable.  Specifically, the State argued that Dr. Cole's testimony should be excluded because allowing contradictory evidence at trial impinged on the trial court's role to make a legal determination about the reliability of the evidence.  Although a trial court makes a legal determination about the reliability of the expert's testimony under rule 702, such a determination is a threshold decision about admissibility.  *See* Utah R. Evid. 702.  Once the court determines that evidence is sufficiently reliable to be admitted at trial, the court may not then violate a defendant's constitutional rights to present an effective defense by excluding conflicting evidence or testimony that challenges that expert's opinion or credibility.  *See Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the . . . Confrontation clause[] of the Sixth Amendment, the Constitution guarantees criminal

---

4. Sheehan had previously attempted to use Dr. Cole's testimony to establish that the State's print evidence and expert testimony should have been excluded because it was unreliable.  However, Sheehan subsequently requested the court to determine whether Dr. Cole's testimony was admissible for trial to rebut the State's evidence and impeach the State's experts' testimony.  Like most evidence, expert testimony can be introduced for different purposes.  While a proponent may first offer evidence for an improper purpose, the initial exclusion does not automatically mean that the evidence must necessarily be permanently excluded.  *See, e.g., Crane v. Kentucky*, 476 U.S. 683, 685-87 (1986) (examining the admissibility of evidence for two different purposes).  While Dr. Cole's testimony was unnecessary to determine whether the State's expert testimony was admissible, *see supra* ¶ 23, the trial court was still required to analyze whether Dr. Cole's testimony was independently admissible, including whether Dr. Cole's testimony would be helpful to the fact finder by challenging the credibility and weight of the State's experts at trial.  *See* Utah R. Evid. 702.

defendants a meaningful opportunity to present a complete defense. . . . That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility . . . when such evidence is central to the defendant's claim of innocence.  In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing." (citations and internal quotation marks omitted)); *Christiansen v. Harris*, 109 Utah 1, 163 P.2d 314, 317 (1945) ("[A]ll the[] me[]thods and means provided [to ensure due process] have the same basic requirements—that no party can be affected by such action, until his legal rights have been the subject of an inquiry by a person or body authorized by law to determine such rights, of which inquiry the party has due notice, and at which he had an opportunity to be heard and to give evidence as to his rights and defenses.  In depriving a person of life or liberty, the essentials of due process are[, inter alia,] . . . [a] fair opportunity to submit evidence, examine and cross-examine witnesses.").  Thus, the trial court's legal determination that the State's expert testimony was admissible did not allow the court to then impinge on the jury's role as the fact finder by excluding the evidence that Sheehan may have used to challenge the credibility and weight of the State's expert testimony.  *See generally Gunn Hill Dairy Props., LLC v. Los Angeles Dep't of Water & Power*, 2012 UT App 20, ¶ 47 ("Under . . . rule [702], the line between assessing reliability and weighing evidence can be elusive.  But the trial court may not cross that line when assessing threshold reliability for purposes of ruling on admissibility pursuant to rule 702.  The court's role is only preliminary; the factfinder bears the ultimate responsibility for evaluating the accuracy, reliability, and weight of the testimony.").

¶28    Quite simply, there are two separate reliability determinations:  admissibility, which is a legal determination the court makes, and the weight assigned to the evidence admitted at trial, which is a factual determination made by the fact finder.  The court cannot impinge on the factual determinations correctly left to the finder of fact by excluding evidence or testimony because the court has made an incorrect legal determination that competing evidence is not reliable for *admissibility* purposes.

¶29    Furthermore, although the trial court retains wide latitude in excluding evidence, there must be a proper basis for doing so.  *See Crane*, 476 U.S. at 689-91 ("[T]he Constitution leaves to judges who must make [evidentiary rulings] 'wide latitude' to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'  Moreover, [the United

States Supreme Court] has never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted. . . . [Nevertheless, i]n the absence of any valid state justification, exclusion of this kind of exculpatory evidence [challenging the credibility of the confession] deprives a defendant of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing." (first omission and third alteration in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)); *accord State v. Chavez*, 2002 UT App 9, ¶ 19, 41 P.3d 1137. Because the trial court misapplied rule 702 to exclude Sheehan's expert and because we see no other justification in the record for this exclusion, we determine that the trial court violated Sheehan's constitutional rights by preventing him from presenting a complete defense.

¶30    However, before we reverse a conviction because the trial court's misapplication of a rule of evidence violated Defendant's constitutional rights, we must determine if the constitutional error was harmless beyond a reasonable doubt. *See Van Arsdall*, 475 U.S. at 681 ("[The U.S. Supreme Court] ha[s] repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt."); *accord State v. Marks*, 2011 UT App 262, ¶ 11, 262 P.3d 13, *cert. denied*, 20110898-SC (Utah Feb. 17, 2012). To determine whether this error was harmless, we would normally evaluate whether Dr. Cole's testimony would have affected the outcome of Sheehan's trial. Although the record of Dr. Cole's anticipated testimony is limited, mainly because the trial court did not allow the defense to proffer or make a record of such testimony, Sheehan did introduce Dr. Cole's Expert Witness Report and Curriculum Vitae (the expert report). The expert report sets forth Dr. Cole's extensive qualifications, associations, and an outline of his publications. The expert report discusses the fallibility of fingerprint identification and specifies those instances in which Dr. Cole has "cataloged cases in which latent print misattributions have occurred, thereby falsifying [the] claim" that print identifications are infallible. The expert report also discusses how "no study has been conducted . . . from which one could measure the accuracy of latent print identification" and "no accuracy measurement [exists because] the technique has not been validated and its accuracy is unknown." "Without an accuracy measurement, it is not possible to convey to the fact-finder how much confidence [he or she] should have [in] a latent print examiner's conclusion." Discussing individualization, the expert report states,

[L]atent print examiners have no data from which to make a responsible estimate of the rarity of a particular configuration of friction ridge details within a population. Without such an estimate, it is not possible to estimate the likelihood that a latent print showing a particular configuration of friction ridge details was made by a person other than the defendant. Without such an estimate, it is not possible to convey to the fact-finder the likelihood that a particular[] latent print derives from a source other than the defendant. To testify, absent such an estimate, that the defendant "is" the source of a particular latent print is inconsistent with scientific and logical thinking.

Finally, the expert report discusses "confirmation bias" by stating,

Psychological studies have demonstrated that latent print examiners can be induced to alter their conclusion based on "contextual information"—that is, information that should be irrelevant to their analysis (such as that other examiners have reached a particular conclusion). This suggests that latent print analysis may be subject to psychological biases, especially if the examiner is cued to believe that the source of a particular exemplar has been identified as a suspect.

¶31    Assuming that Dr. Cole would have testified to this same information at trial, we determine that the jury's verdict would have been affected by this contradictory evidence. Importantly, the most damaging evidence admitted against Sheehan, and the only evidence placing Sheehan at the scene of the attack, was the print evidence. If Dr. Cole had been allowed to testify and challenge the reliability and validity of the State's expert witnesses, the jury could have easily found that reasonable doubt existed regarding whether Sheehan assaulted the victim, especially given her earlier identification of a different perpetrator.

¶32    However, this determination assumes that Dr. Cole could be correctly qualified as an expert under rule 702. The trial court did not make any of the necessary findings or determinations pursuant to rule 702 concerning whether Dr. Cole qualified as an expert, i.e., that the expert's testimony "will assist the trier of fact," that the expert is

qualified, and that the expert's testimony meets the threshold reliability standard.[5] *See* Utah R. Evid. 702(a)-(c); *State v. Clopten*, 2009 UT 84, ¶ 31, 223 P.3d 1103. Therefore, given the facts of this case, we are unable to properly evaluate prejudice because the court's error denied Sheehan the opportunity to develop whether Dr. Cole would qualify as an expert and whether any testimony he would have given at trial was admissible. We express no opinion on whether Dr. Cole is qualified under rule 702 or whether his proposed testimony is sufficiently reliable for admission and leave that determination to the trial court on remand under the correct legal standard.[6] Nevertheless, because we also determine that the trial court violated Sheehan's constitutional rights in limiting the cross-examination of the State's experts, *see infra* ¶¶ 35-38, any determination of whether Dr. Cole qualifies as an expert should be made before the new trial is held.

B. Limiting Cross-Examination of the State's Experts Violated Sheehan's Confrontation Right.

¶33    The trial court also based its exclusion of Dr. Cole's testimony on the assumption that the studies Dr. Cole would testify about could be explored on cross-examination of the State's experts. However, at trial, the court limited Sheehan's ability to cross-examine the State's experts about this very matter, specifically refusing to allow Sheehan to rely on reports that discussed the error rates in matching prints. On appeal,

---

5. The trial court's refusal to allow the defense to make a record to aid in our review is apparent from the July 2, 2008 hearing regarding whether to hold a *Rimmasch* hearing. During that hearing, Sheehan repeatedly asked the court to allow Dr. Cole, who was present at the hearing and had come from California, to testify, at least to make a record. The court repeatedly refused such a request.

6. On remand and in the context of determining whether Dr. Cole qualifies to testify at the new trial, if the trial court determines that Dr. Cole's testimony is admissible, Sheehan was necessarily prejudiced by the trial court's error and the new trial will remedy the error. However, if the court determines that Dr. Cole's testimony is not admissible, then Sheehan could not have been prejudiced by the exclusion of Dr. Cole's testimony at the first trial. In any event, Sheehan is entitled to the new trial based on the improper limitation the trial court placed on the cross-examination of the State's experts. *See infra* ¶¶ 35-38

Sheehan challenges the limitations the court placed on his cross-examination regarding the reliability of print evidence.

¶34 "The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). "'The main and essential purpose of confrontation is *to secure the opponent the opportunity of cross-examination*.'" *Id.* (quoting *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974)). The Confrontation "Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford v. Washington*, 541 U.S. 36, 61 (2004). "'[T]he exposure of a witness'[s] motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.'" *Van Arsdall*, 475 U.S. at 678-79 (quoting *Davis*, 415 U.S. at 316-17).

> It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant.

*Id.* at 679; *accord State v. Hamblin*, 2010 UT App 239, ¶ 22, 239 P.3d 300, *cert. denied*, 245 P.3d 757 (Utah 2010).

> A defendant's confrontation right is violated, however, if a court prohibits the defendant from "engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose the jury to the facts from which [it] . . . could appropriately draw inferences relating to the reliability of the witnesses."

*Hamblin*, 2010 UT App 239, ¶ 22 (alteration and omission in original) (quoting *Van Arsdall*, 475 U.S. at 680) (additional internal quotation marks omitted).

¶35    The trial court refused to allow Sheehan to cross-examine the State's experts about the subjectivity and error rate associated with making print identifications. Thus, the jury was not allowed to hear about all of the problems that may arise in making print identifications. This information defense counsel sought to elicit directly related to the credibility of the State's experts and to the weight that the jury might give the experts' testimony, especially because both experts claimed to be 100% accurate. *See Olden v. Kentucky*, 488 U.S. 227, 231 (1988) (per curiam) (stating that under U.S. Supreme Court case law "'the cross-examiner has traditionally been allowed to impeach, i.e., discredit the witness,'" (quoting *Davis*, 415 U.S. at 316), and "that 'a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness,'" (quoting *Van Arsdall*, 475 U.S. at 680) (additional internal quotation marks omitted)); *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986).

¶36    In excluding the reports and limiting the cross-examination of the State's experts, the trial court did not provide an appropriate justification for why the evidence could not be used to impeach the State's experts' testimony. *See Michigan v. Lucas*, 500 U.S. 145, 149 (1991) ("[T]he right to present relevant testimony is not without limitation. The right may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. . . . [F]or example, . . . trial judges retain wide latitude to limit reasonably a criminal defendant's right to cross-examine a witness based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." (first alteration in original) (internal quotation marks omitted)); *Crane*, 476 U.S. at 690-91. By limiting Sheehan's cross-examination and attempts to impeach the State's experts without any valid justification, the trial court's limitations violated Sheehan's constitutional right to confrontation.

¶37    Notwithstanding this constitutional error, we will only reverse Sheehan's conviction if the error was prejudicial. *See Van Arsdall*, 475 U.S. at 684.

The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.*

¶38    In this case, the trial court's error in limiting Sheehan's use of the evidence proffered to cross-examine the State's experts was not harmless. *See id.* The State's case relied almost entirely on the print identification made by the State's experts, making the State's experts' testimony crucial in its case against Sheehan. No other evidence corroborated that Sheehan was physically present at the victim's residence on the night of the attack. The State did not elicit testimony from the victim, presumably because of her inconsistent identification of her attacker. Furthermore, the court did not allow the defense to cross-examine the State's experts to challenge their subjectivity and possible misidentification of the print evidence. Thus, because the constitutional error was not harmless beyond a reasonable doubt, we reverse Sheehan's convictions.[7]

---

7. Although we determine that Sheehan's constitutional rights were violated by both the exclusion of his expert and evidence, and the limitations on cross-examination, the specific facts of this case lead to that conclusion. We recognize that, had the trial court allowed the expert to testify, then the limitations on cross-examination may not have been prejudicial, or had the trial court allowed cross-examination, then the limitations on the expert testimony may not have been prejudicial. *See generally State v. Clopten*, 2009 UT 84, ¶ 16, 223 P.3d 1103 ("[I]n the absence of expert testimony, a defendant is left with two tools—cross-examination and cautionary instructions—with which to convey the possibility of a mistaken identity to the jury.").

CONCLUSION

¶39     Although the trial court did not abuse its discretion in determining that the State's experts were allowed to testify at trial, the trial court erred in excluding Sheehan's expert witness, which may have been prejudicial.  We reverse Sheehan's convictions and remand for a new trial because the trial court erred in limiting Sheehan's cross-examination of the State's experts, which was not harmless beyond a reasonable doubt.


_____
Michele M. Christiansen, Judge

                                    -----

¶40     WE CONCUR:


_____
Gregory K. Orme, Judge


_____
William A. Thorne Jr., Judge