2025 UT App 52

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
PATRICK KOANEIL BROWN,
Appellant.

Opinion
No. 20230312-CA
Filed April 17, 2025

Third District Court, Salt Lake Department
The Honorable Adam T. Mow
No. 211904632

Sarah J. Carlquist, Attorney for Appellant

Derek E. Brown and Jeffrey D. Mann,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN D. TENNEY and JOHN D. LUTHY concurred.

MORTENSEN, Judge:

¶1 Patrick Koaneil Brown admits he shot and killed David[1] following a heated exchange, but he maintains he acted in self-defense. He claims that he tried to deescalate the situation, his efforts failed, and when David rammed his car into the back of Brown's car, he felt he had no choice but to shoot David. A jury found Brown guilty of murder, but the conviction was reduced to manslaughter because the jury credited Brown's claim of imperfect self-defense. Brown was also convicted of multiple counts of discharge of a weapon. At trial, a detective (Detective) was allowed to testify, over Brown's objection, that David's ramming of Brown's car constituted criminal mischief under the

---

1. A pseudonym.

law, essentially explaining why the instruction on perfect self-defense, which the jury would soon confront, would not apply. Because we agree that Detective should not have been allowed to testify to inadmissible legal conclusions and that Brown was prejudiced by the admission of this testimony, we vacate Brown's conviction and remand this matter for a new trial.

## BACKGROUND

¶2      One April morning in 2021, David was driving his fiancée (Fiancée), his sixteen-year-old daughter (Daughter), and the two-year-old daughter he shared with Fiancée to breakfast. At the same time, Brown was selling clothes out of the back of his car to David's friend. David stopped to talk to his friend but was soon distracted by Brown and his car. David began making fun of Brown's car, and the conversation escalated. David got "out of the car and stepped to [Brown]." Fiancée reported that David wanted to fight Brown. After David "got out of the car, [Brown] went into his car and got [a] gun." According to Fiancée, David was upset that Brown had retrieved his gun, an action that made David more willing to fight Brown. Daughter testified that Brown retrieved his gun because he was scared of David and that "[e]verybody" knew that David liked to fight. She further testified that Brown "didn't put the gun away right away 'cause [David] was still in [Brown's] face."

¶3      Eventually, Brown "went back to his car and put [the gun] away." Fiancée heard Brown say, "Let's drop it," and Brown "got[] back in his car and tried to drive" away. But David got in his own car and followed Brown.

¶4      David followed Brown for several blocks, all the while "[y]elling out the window," "cussing and honking," and "trying to [incite] a fight" because "he wanted to fight." David was following so closely that Brown feared he may be trying to ram into his car.

¶5     This pattern continued until Brown stopped his car at a red light. Once stopped, Brown leaned out his window and said, "If you follow me for another block, I'm going to shoot you in front of your family." In response, David hit the gas and "rammed [into] the back of" Brown's vehicle. David immediately backed up about 150 feet and stopped. At the same time, Brown proceeded into the intersection, made a U-turn, and drove toward David, who had exited his vehicle and was now standing on the street next to his car. Brown would later tell police that he drove toward David because all he "was tryin' to do is follow [David] since he rammed [Brown's] truck, and get his tag number."

¶6     A bystander reported that when David got out of his car he did not appear to be "de-escalating the situation." Rather, he "had his hands down in, like, a clenched fist," looking "like he was ready to fight him." According to another bystander, David "got out looking like he wanted to fight." And he "[k]ind of threw his hands up" and looked like "he was kind of calling [Brown] on."

¶7     As Brown drove past David, he slowed and fired four shots out the driver's side window, hitting and killing David. When arrested, Brown explained that he was scared and thought David had a weapon: "I got caught in the situation. I'm accepting responsibility. I ain't acting like I'm innocent. I know what I did was wrong. I wasn't tryin' to kill him. I wasn't trying to shoot him up there. But when he jumped out the truck it scared me. I thought he had a weapon." Brown further theorized that David had made a phone call to a known drug dealer who was on his way to harm Brown.

¶8     Brown was charged with one count of murder, three counts of discharge of a weapon, and one count of possession of a dangerous weapon by a restricted person.

¶9     At trial, Brown's primary argument was that the jury should find him not guilty because he acted in self-defense. The

jury was instructed on the law governing self-defense. Under Utah law,

> An individual is justified in using force intended or likely to cause death or serious bodily injury only if the individual reasonably believes that force is necessary to prevent death or serious bodily injury to the individual or another individual as a result of imminent use of unlawful force, or to prevent the commission of a forcible felony.

Utah Code § 76-2-402(2)(b). The jury was further instructed on Utah law's definition of "forcible felony," which specifically includes "aggravated assault." *Id.* § 76-2-402(1)(a).

¶10　The jury was also instructed on the differences between perfect and imperfect self-defense and on the defense of extreme emotional distress. The jury instructions explained that perfect self-defense is a complete defense to murder while imperfect self-defense is an incomplete defense. Imperfect self-defense applies when defendants reasonably but incorrectly believe that they satisfy the requirements for self-defense. The instructions further explained that extreme emotional distress applies when the defendant acts under the extreme emotional distress that was caused by the decedent's highly provoking act immediately preceding the offense.

¶11　In his opening statement, Brown's counsel (Counsel) set up Brown's argument that his actions were justified as self-defense by arguing that "if someone rams someone with a car, it's an aggravated assault." Later in the trial, Detective was called and testified regarding David's ramming of Brown's car. Detective stated that David's conduct constituted criminal mischief and not aggravated assault: "[I]n my training and experience, to me with the damage[] on the back bumper, it was more so of a criminal mischief rather than an aggravated-assault-type thing." Counsel objected, arguing that Detective's statement was improper

opinion testimony that constituted an impermissible legal conclusion and it was also improper expert testimony. The State responded, saying that Detective was merely "testifying about his training and experience" and that the testimony may be "damaging, but it's not improper."

¶12   The court overruled Counsel's objection. Detective then continued to testify, highlighting his "training and experience" from having "investigated multiple accidents" and "multiple criminal mischief situations." He concluded that "in [his] professional experience," given the "totality of the circumstances," David's ramming of Brown's car "would have been a criminal mischief, at most."

¶13   Then, in closing argument, the prosecutor highlighted the importance of Detective's testimony: "Now I'm not going to get too far into the weeds on this 'prevent the commission of a forcible felony' because you heard both law enforcement officers tell you this isn't an aggravated assault. This is a destruction of property."[2] Later the prosecutor argued, "I'm telling you what the officers told you that the damage to [Brown's vehicle] is consistent with a road-rage-criminal-mischief-damage-of-property type of accident."

¶14   The jury found Brown guilty on all counts. But the murder conviction was reduced to manslaughter because the jury also found Brown acted in imperfect self-defense and with extreme emotional distress.

---

2. Another police officer (Sergeant) offered general testimony about vehicle ramming incidents and aggravated assault. Sergeant testified that she would not cite a person who "intentionally rammed" another vehicle for aggravated assault but "for something else." Sergeant did not mention criminal mischief, nor did she specifically discuss David's ramming of Brown's vehicle.

ISSUE AND STANDARD OF REVIEW

¶15 Brown appeals and argues that the court erred when it overruled Counsel's objection and admitted Detective's testimony regarding David ramming Brown's car. "We review the trial court's determinations regarding the admissibility of evidence under an abuse of discretion standard." *Anderson v. Thompson*, 2008 UT App 3, ¶ 25, 176 P.3d 464.[3]

ANALYSIS

¶16 Detective improperly testified to the legal definition and implications of David ramming Brown's car, and that testimony was prejudicial. Accordingly, as explained below, we must vacate Brown's conviction and remand this matter for a new trial.

¶17 Under Utah case law, a witness may not testify to a legal conclusion. *State v. Davis*, 2007 UT App 13, ¶ 15, 155 P.3d 909 ("Opinions that tell the jury what result to reach or give legal conclusions continue to be impermissible." (cleaned up)). "Testimony is likely to constitute an impermissible legal conclusion if it is framed in a way that is unhelpful to the factfinder; blurs the separate and distinct responsibilities of the judge, jury, and witness; or creates a danger that a juror may turn to the witness's legal conclusion rather than the judge for guidance on the applicable law." *State v. Brown*, 2019 UT App 122, ¶ 28, 447 P.3d 1250 (cleaned up); *see also Davis*, 2007 UT App 13, ¶¶ 15–16; *Davidson v. Prince*, 813 P.2d 1225, 1231 (Utah Ct. App. 1991) ("It [is] clear that questions which would merely allow the witness to tell the jury what result to reach are not permitted. Nor

---

3. Brown also raises several other issues on appeal, including claims of ineffective assistance of counsel, cumulative error, and lack of merger. Given our resolution of this appeal on the issue discussed herein, we need not address these other issues.

is [rule 704 of the Utah Rules of Evidence[4]] intended to allow a witness to give legal conclusions." (cleaned up)). "Witnesses quite clearly provide impermissible legal conclusions when they tie their opinions to the requirements of Utah law." *State v. Zimpfer*, 2024 UT App 136, ¶ 36, 558 P.3d 111 (cleaned up).

¶18　In *State v. Tenney*, 913 P.2d 750 (Utah Ct. App. 1996), two expert witnesses testified that the defendant's actions violated the Utah Uniform Securities Act. *Id.* at 756. There, we held that "[d]espite the fact that there is no bright line between responses that embrace an ultimate issue and those that provide an impermissible legal conclusion, those portions of the expert witnesses' testimony to which [the] defendant objects quite clearly state legal conclusions because the witnesses tie their opinions to the requirements of Utah law." *Id.*[5] As demonstrated by *Tenney* and the related case law, witnesses give improper legal conclusions when they couch their opinions as legal conclusions, tie their opinions to the requirements of Utah law, or otherwise tell the jury what conclusion to reach. *See Steffensen v. Smith's Mgmt. Corp.*, 862 P.2d 1342, 1347 (Utah 1993) ("Opinion testimony is not helpful to the fact finder when it is couched as a legal conclusion."); *State v. Chapman*, 2014 UT App 255, ¶ 20, 338 P.3d 230 (concluding that testimony was admissible because the witness did not "couch his opinion specifically in terms of what is required under Utah law, or otherwise tell the jury what conclusion to reach").

---

4. "An opinion is not objectionable just because it embraces an ultimate issue." Utah R. Evid. 704(a).

5. In cases dealing with highly technical issues "not within the knowledge of the average" layperson, expert witnesses may be allowed to offer an opinion on mixed questions of law and fact, but they still may not "improperly instruct[] the jury on the law." *State v. Larsen*, 865 P.2d 1355, 1361–62 (Utah 1993) (cleaned up).

¶19    Here, Detective's testimony was clearly tied to Utah Code section 76-2-402(2)(b), which requires a forcible felony to justify deadly force in self-defense, and section 76-2-402(1)(a), which specifically includes aggravated assault and not criminal mischief within the definition of forcible felony. Utah law states that "[a]n individual is justified in using force intended or likely to cause death or serious bodily injury if the individual reasonably believes that force is necessary to . . . prevent the commission of a *forcible felony*." Utah Code § 76-2-402(2)(b) (emphasis added). And Utah law's definition of "forcible felony" specifically includes "aggravated assault" but not criminal mischief. *Id.* § 76-2-402(1)(a). Accordingly, whether the circumstances here amounted to a forcible felony, as opposed to criminal mischief, was a question with which the jury would be directly confronted. Indeed, the jury instructions directed the jury to determine whether Brown had been faced with a forcible felony. The instructions further defined "forcible felony" to include "aggravated assault."

¶20    At trial, Detective testified about how David's actions would have qualified only as "criminal mischief" and not as "aggravated assault." In his briefing, Brown explains that his "defense was that [David] committed a forcible felony when he rammed his car into Brown's car and that Brown had a right to use deadly force to defend that forcible felony." So, Brown concludes, "when Detective was allowed to repeatedly and conclusively testify that [David] ramming his car into the back of Brown's car was 'criminal mischief rather than an aggravated-assault-type thing[,]' . . . his testimony foreclosed Brown's claim of perfect self-defense." Brown complains that "Detective's testimony directly and significantly undermined Brown's claim of perfect self-defense."

¶21    Of course, "when witnesses have used a term in its ordinary meaning rather than its legal meaning, we have determined that their testimony was appropriately admitted."

*Zimpfer*, 2024 UT App 136, ¶ 38 (cleaned up).[6] But "criminal mischief" doesn't really have an ordinary meaning, and it's hardly a term used in day-to-day parlance. It is difficult to conjure up a purpose for Detective to be testifying to the difference between aggravated assault and criminal mischief and their relevance here *other* than to undermine the jury's independent role by concluding for it that no aggravated assault had occurred. Thus, it's clear that Detective offered improper legal conclusions at trial by directly tying his testimony to the requirements of Utah law and instructing the jury on the correct legal resolution of issues within its purview. Accordingly, the district court abused its discretion in overruling Brown's objection to this testimony.

¶22 But the fact that Detective's testimony was improper does not alone merit reversal. Brown must also demonstrate that he was prejudiced by this testimony. "An evidentiary error requires reversal only if there is a reasonable likelihood of a more favorable result for the accused had the error not occurred. A reasonable likelihood of a more favorable outcome exists if our confidence in the result of the trial is eroded." *State v. Lopez*, 2018 UT 5, ¶ 30, 417 P.3d 116 (cleaned up). Here, our confidence in the result of this trial has been eroded for at least two reasons.

¶23 First, appellate courts should proceed with caution when a party completely changes its tune between the trial and the appeal as to the significance and materiality of certain testimony. Of course, just because a party argues for the admission of evidence, even in the face of an objection, it does not necessarily follow that an appellate court must conclude that any error in admitting the evidence was prejudicial. After all, on appeal, evidence is viewed

---

6. Indeed, one of the deciding factors in the court's determination that the testimony in *State v. Larsen*, 865 P.2d 1355 (Utah 1993), was admissible was the fact that the word "'materiality' has a popular meaning bearing directly on the factual issue before the jury." *Id.* at 1362. The same cannot be said for "criminal mischief."

in light of the totality of the circumstances, including against the backdrop of all the other evidence that was admitted at trial. Often the balance of the evidence is so compelling that wrongfully admitted evidence is still harmless. It remains concerning, however, for a party to specifically highlight evidence as being particularly important at the trial level, not just in the context of responding to an objection, but also in arguing to the jury that it should focus on that evidence and give great weight to it, only to turn around at the appellate level and assert that the same evidence did not meaningfully alter the evidentiary picture after all. Here, the State specifically, repeatedly, and affirmatively advocated for the importance of the same testimony that it now characterizes as not having great significance.

¶24 Members of the Utah Supreme Court have advised courts to "tread carefully" in these situations. *State v. Ellis*, 2018 UT 2, ¶ 55, 417 P.3d 86 (Himonas, J., concurring). It would be problematic "if our trial courts were to regularly admit testimony based, in part, on the State's representation that it's crucial, only to have our appellate courts affirm the resulting conviction because the error in admitting the testimony was harmless." *Id.* ¶ 56; *see also State v. Farnworth*, 2018 UT App 23, ¶ 36, 414 P.3d 1053 ("Where a prosecutor has touted the importance of erroneously admitted evidence, we should be hesitant to find its admission harmless, let alone harmless beyond a reasonable doubt."). Unlike many, or even most, cases where we review the harmful effect of improperly admitted evidence that is perhaps ancillary to a party's case, if (1) a party places significant emphasis on the evidence in the presentation of its case *and* highlights that specific evidence in its argument *and* invites the jury to not only focus on the evidence but base its ultimate determination on the evidence and (2) it appears that the jury, in part, credited the opposing party's theory as reflected in its verdict, then our confidence is more likely to be undermined.

¶25 Though the State on appeal argues that "Detective's testimony that the collision wasn't aggravated assault was . . . harmless," that is a far cry from the story the State told at the trial level. At trial, the State repeatedly elicited testimony from Detective to establish that the ramming was criminal mischief and not aggravated assault. The State vigorously defended against objections to the admission of that testimony, specifically telling the judge that it understood "that it's damaging, but it's not improper."[7]

¶26 Then, in closing argument, the State doubled down on the importance of Detective's testimony by repeatedly insinuating that Brown's self-defense claims were meritless because David's actions did not satisfy the statutory requirement. The State argued, "Now I'm not going to get too far into the weeds on this 'prevent the commission of a forcible felony' because you heard both law enforcement officers tell you this isn't an aggravated assault. This is a destruction of property." Later the State said, "I'm telling you what the officers told you that the damage to [Brown's vehicle] is consistent with a road-rage-criminal-mischief-damage-of-property type of accident." The State's affirmative statements below that this testimony was important to

---

7. Curiously, when Brown attempted to cross-examine Detective on the testimony he had just given, the State objected and the district court sustained that objection. Regardless of the admissibility of any testimony, once the court has allowed a witness to testify, that testimony can be challenged in cross-examination. *See State v. Sheehan*, 2012 UT App 62, ¶ 27, 273 P.3d 417 ("Once the court determines that evidence is sufficiently reliable to be admitted at trial, the court may not then violate a defendant's constitutional rights to present an effective defense by excluding conflicting evidence or testimony that challenges that expert's opinion or credibility.").

its case give us significant pause when analyzing the State's argument on appeal that the testimony was in fact harmless.[8]

¶27 Second, and more importantly, under the particular factual circumstance of this case and the verdict that the jury rendered, our "confidence in the result of the trial is eroded" because there is reason to believe that the jury gave Detective's testimony significant weight, just as the prosecutor asked it to. *See Lopez*, 2018 UT 5, ¶ 30 (cleaned up). This is the case because the distinction between perfect and imperfect self-defense was crucial to the jury's determination:

> Self-defense may be perfect or imperfect. Perfect self-defense is a complete justification and bars a conviction. It applies when a defendant reasonably believes that unlawful force against him is

---

8. The State also argues that Detective's testimony was harmless because "it was cumulative of another Sergeant's unchallenged testimony providing the same opinion." *See State v. Miranda*, 2017 UT App 203, ¶ 47, 407 P.3d 1033 ("[W]hen erroneously admitted evidence is cumulative of evidence already before the factfinder, the error may be considered harmless."). However, in this case, Detective's testimony was not cumulative of Sergeant's testimony. Sergeant testified that she would not cite a person who "intentionally rammed" another vehicle for aggravated assault but "for something else"; she explained, "You can't [cite] for aggravated assault. It's a felony charge." Sergeant's testimony and the questions that elicited it were theoretical in nature, asking about what Sergeant *would* do in a hypothetical situation. In contrast, Detective's testimony very specifically stated a legal conclusion about *David's* actions in *this* case. In this way, Detective's testimony certainly added something "new or additional to the evidentiary picture" and thus was not cumulative of Sergeant's testimony. *See State v. Samples*, 2022 UT App 125, ¶ 74, 521 P.3d 526 (cleaned up).

imminent and he is legally justified in using force to defend himself. Imperfect self-defense is a partial justification. It reduces a murder charge to manslaughter when a defendant reasonably, but mistakenly, believes that the circumstances provided a legal justification or excuse for the use of deadly force.

*State v. Silva*, 2019 UT 36, ¶ 25, 456 P.3d 718 (cleaned up).

¶28 The jury instructions in this case reflected this distinction: "Perfect self-defense is a complete defense to Murder." "The defendant is justified in using force intended or likely to cause death or serious bodily injury . . . if the defendant reasonably believes that . . . [f]orce is necessary to prevent . . . the commission of a forcible felony." The jury instructions go on to explain, "You must consider imperfect self-defense only if you find the defendant guilty of Murder. Imperfect self-defense is a partial defense to Murder. It applies when the defendant caused the death of another while incorrectly, but reasonably, believing that his conduct was legally justified or excused."

¶29 In this case, the jury found that the defense of imperfect self-defense did apply. That means the jury found that Brown was reasonable in believing that his self-defense was legally justified but that he was mistaken in that belief.

¶30 The State argues that, as a matter of law, Brown's self-defense came "too late." *See State v. Berriel*, 2013 UT 19, ¶ 14, 299 P.3d 1133 ("The imminence requirement distinguishes lawful defensive force from two forms of unlawful force: that which comes too soon and that which comes too late. A preemptive strike against a feared aggressor is illegal force used too soon; and retaliation against a successful aggressor is illegal force used too late." (cleaned up)). The State asserts that because the ramming was completed before Brown shot and because any threat of a forcible felony had abated, Brown could not have been justified in

using deadly force. But that interpretation of events is not the only explanation of the facts. Just because one act of ramming had been completed, it did not mean that, in the moment, Brown thought there was no risk of being rammed again. Brown had tried to deescalate the situation, but the drawn-out nature of the encounter may have signaled to Brown that David was intent on harming him. More specifically, the ramming may have caused Brown to believe that David was not afraid to cause him bodily harm by using his automobile to chase him.

¶31 The jury had already indicated that it viewed the circumstances in some measure as Brown did. Its verdict indicates that jury members thought Brown was reasonable in his belief that lethal force was necessary but that he was mistaken in that belief. But why did they think he was mistaken? Here, the jury could have looked at the totality of the circumstances and deferred to Detective's conclusion that the threat could not constitute a forcible felony. After all, the verdict indicates that the jury thought Brown's belief that he needed to defend himself was reasonable, but some additional factor made his use of force not legally justified. It is the origin of this *additional factor* that gives us pause. In one scenario, the jury might have looked at the totality of the circumstances and simply determined that deadly force was not justified. In that case, the verdict would be unassailable on appeal. But in another equally or more likely scenario, the jury might have done exactly as the prosecutor invited it to do and deferred to the legal opinion of Detective. And if it did so defer, then its verdict is infirm.

¶32 Accordingly, our confidence in the result is undermined because it appears the jury may have relied on—and, in fact, probably did rely on—Detective's improper testimony and interpreted it to mean that Brown's actions could not possibly have been legally justified. The State's view of the evidence—that any threat had abated—is also a reasonable one, but it is one that the State should argue to a jury and not a call that should be made

by this court. Both sides should present their varying views of the evidence without the taint of improperly admitted evidence.

¶33 Detective's testimony was improper and it prejudiced Brown's case. Brown should have the benefit of a trial without the influence of Detective's improper legal conclusions.

## CONCLUSION

¶34 The district court abused its discretion in allowing Detective's improper testimony. In the context of this case, the admission of that testimony and the prosecutor's overt emphasis on it prejudiced Brown and undermines our confidence in the verdict. As a result, we vacate Brown's conviction and remand the matter for a new trial.

_____