**2019 UT App 122**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
TONIA SCHNAE BROWN,
Appellant.

Opinion
No. 20161036-CA
Filed July 18, 2019

Third District Court, Salt Lake Department
The Honorable Vernice S. Trease
No. 151902943

Debra M. Nelson, Attorney for Appellant

Sean D. Reyes and William M. Hains, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES GREGORY K. ORME and DIANA HAGEN
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     Tonia Schnae Brown appeals her convictions on three counts of securities fraud, second-degree felonies. We affirm.

BACKGROUND

¶2     Two Utah residents, Victim and Friend, were introduced to Brown by a mutual friend (Advisor). Brown had informed Advisor that she had made a substantial amount of money as a commercial real estate broker prior to the financial crisis of 2008 but had moved her funds to offshore accounts at that time because she was concerned about the United States' financial system. She claimed to have just under $50 million in

an account at InterBank, a bank operating out of Saint Vincent and the Grenadines, as well as $300,000 in an account with the Bank of China in Hong Kong. Brown represented that she owed $59,500 in value added taxes (VAT) to the Hong Kong government and that her accounts were frozen until she paid the money.

¶3    Brown signed a promissory note stating that she would pay Victim $1 million when her accounts were unfrozen if Victim would send Brown the $59,500 for the VAT. Brown assured Victim that "there was no risk" and she could return her money "at any time." Victim took out a home equity loan in the amount of $59,500 and wired the money as directed by Brown.

¶4    Instead of delivering the promised $1 million, Brown delivered a letter to Victim, purportedly from the Bank of China, stating that the VAT had increased and that an additional $80,500 was needed to pay the VAT. Brown signed a new promissory note in which she committed to deliver $2 million in exchange for the total $140,000 needed to pay the VAT, and Friend loaned Brown the additional $80,500.

¶5    Once again, Victim and Friend received a letter, purportedly from the Bank of China, informing them that an additional $210,000 was needed to release the frozen funds. Brown urged Victim and Friend to provide the additional funds, but instead Victim contacted the Federal Bureau of Investigation, the Securities and Exchange Commission, and a private attorney to report that she and Friend may have been defrauded by Brown. Victim and Friend made various attempts to recover the funds from Brown but were unsuccessful.

¶6    Victim also made her own inquiries, reaching out to the Hong Kong Monetary Authority (HKMA) and government authorities in Saint Vincent and the Grenadines, as well as hiring attorneys in Hong Kong to look into the validity of Brown's claims. She learned that Hong Kong does not have a VAT and that the documentation Brown had provided from both the Bank

of China and the HKMA were likely not authentic. Victim also discovered that there was no record of InterBank in Saint Vincent and the Grenadines and that the address on InterBank's letterhead—appearing on a document provided by Brown—was invalid.

¶7    The State charged Brown with three counts of securities fraud in connection with this incident, all second-degree felonies. Brown elected to represent herself in the criminal case. But before the trial court allowed Brown to proceed pro se, it conducted a full colloquy regarding Brown's education, her understanding of the charges, her understanding of the law, and her constitutional right to have counsel appointed. The court "strongly urge[d]" Brown not to represent herself, but she elected to do so anyway. The court then accepted Brown's waiver of counsel, finding that it was knowing, voluntary, and intelligent.

¶8    The State called a securities expert, Bryan Allen, to testify at trial. Allen testified that "securities laws impose a requirement on . . . sellers of securities, to provide full and fair disclosure." He explained that disclosure is fraudulent if the seller fails to provide an investor with "all material facts related to the investment" or "omit[s] . . . any information that would make the statements . . . misleading." Allen further defined "material" as "any[thing] that a reasonable investor would find important in deciding to purchase . . . or sell the security."

¶9    During his testimony, Allen provided a list of "examples of what might be considered material facts or information in the securities industry," including (1) relevant information about the seller's business or industry; (2) information about the parties involved in the transaction, including their experience and education as well as any negative information about them, such as prior convictions, judgments against them, or prior bankruptcies; (3) how the money would be used and how it would be expected to generate a return for the investor; and (4) the risks involved in the investment.

¶10 When asked about his experience, Allen acknowledged that he was not an international lawyer and was not an expert in Hong Kong law. However, he asserted that he knew "enough about international finance" to recognize if a transaction "doesn't seem quite right."

¶11 The State called Allen to the stand a second time after he had the opportunity to observe the other witnesses' testimonies at trial. At that point, Allen opined that specific statements and omissions made by Brown would be "important to the average reasonable investor," including (1) that she had earned $50 million brokering commercial real estate, (2) that she was required to pay a VAT in Hong Kong, (3) that she banked with InterBank, (4) that she had previously received information suggesting that InterBank did not exist, (5) that she had several unpaid civil judgments against her, and (6) that she asserted there was "no risk" involved in the investment.

¶12 Finally, the State submitted two exhibits that Allen had relied on in forming his opinions (collectively, the printouts): (1) a printout from the website of the Saint Vincent and the Grenadines Financial Services Authority publicly warning that InterBank "is not and has never been registered or licensed by the St. Vincent and the Grenadines Financial Services Authority" and that the Authority "is not aware of any such business housed" at the address listed on the documents provided to Victim and Friend, and (2) a printout from the Hong Kong Government website stating that it has no VAT. Brown did not object to the admission of the printouts, even when asked by the court if she did. Allen then read portions of the printouts aloud to the jury and stated that the information in them had helped him form the basis of his opinion as to whether the transactions in this case had characteristics of securities fraud.

¶13 After all the evidence was submitted, the trial court met with the prosecutor and Brown to go over each of the State's proposed jury instructions. Instructions 33, 34, and 35 concerned the definition of willfulness, how a seller's duty to investigate

impacts willfulness, and the effect of ignorance of fact on a willfulness finding. When the court learned that the definition of willfulness contained in the proposed instructions was not based on the Model Utah Jury Instructions, the court questioned the prosecutor about the accuracy of the instructions and whether he was aware of any contrary case law. The prosecutor replied that his office had been using the same definition of willfulness "for years" and represented that it was consistent with Utah case law, specifically *State v. Chapman*, 2014 UT App 255, 338 P.3d 230, which the prosecutor stated was the most recent case on the subject. Brown affirmatively stated that she understood each instruction and did not object to any of them.

¶14    Following trial, the jury convicted Brown on all three counts, and Brown was sentenced to three concurrent terms of one to fifteen years in prison and ordered to pay restitution of $140,000. Accepting the help of appointed counsel, Brown now appeals.

ISSUES AND STANDARDS OF REVIEW

¶15    Brown first argues that the jury instructions incorrectly instructed the jury regarding her duty to investigate and how that duty impacted a finding that she acted willfully. This issue was not preserved below, and Brown therefore asks us to review it under the doctrines of plain error and exceptional circumstances.

¶16    Brown also argues that she should be granted a new trial as a result of allegedly inappropriate expert testimony and the erroneous admission of the printouts. As with her challenge to the jury instructions, this issue was not raised below, and Brown asks us to review it for plain error.

¶17    In order to prevail on grounds of plain error, an appellant must show that "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e.,

absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993). "Exceptional circumstances is a doctrine that applies to rare procedural anomalies. We apply this exception sparingly, reserving it for the most unusual circumstances where our failure to consider an issue that was not properly preserved for appeal would have resulted in manifest injustice." *In re K.A.S.*, 2016 UT 55, ¶ 19, 390 P.3d 278 (quotation simplified).

¶18 Finally, Brown asserts that the cumulative effect of these errors requires that she be granted a new trial. "Under the cumulative error doctrine, we will reverse only if the cumulative effect of the several errors undermines our confidence that a fair trial was had." *Dunn*, 850 P.2d at 1229 (quotation simplified).

ANALYSIS

I. Jury Instructions

¶19 On appeal, Brown challenges several of the trial court's instructions to the jury. Brown did not raise any objection to the jury instructions in the trial court but has asked us to review her challenges on appeal on grounds of plain error and exceptional circumstances.

A. Brown's Plain Error Challenge to the Jury Instructions Is Barred by the Invited Error Doctrine.

¶20 Brown asserts that the trial court incorrectly instructed the jury regarding Brown's duty to investigate and the extent to which her ignorance of fact could be claimed as a defense to securities fraud. *See State v. Moore*, 2015 UT App 112, 349 P.3d 797. However, Brown affirmatively represented to the trial court that she had no objection to the proposed jury instructions. "Under the doctrine of invited error, we have declined to engage

in even plain error review when counsel, either by statement or act, affirmatively represented to the trial court that he or she had no objection to the proceedings." *State v. Winfield*, 2006 UT 4, ¶ 14, 128 P.3d 1171 (quotation simplified). While a pro se litigant "should be accorded every consideration that may reasonably be indulged," she will ultimately "be held to the same standard of knowledge and practice as any qualified member of the bar." *Id.* ¶ 19 (quotation simplified). And we have previously rejected the assertion that a pro se litigant should be excused from the invited error doctrine. *See id.* ¶¶ 18–20 (finding invited error with respect to a claim of jury bias where a pro se litigant affirmatively represented to the trial court that he found the empaneled jury acceptable and specifically rejecting the assertion that the defendant's pro se status exempted him from the invited error doctrine).

¶21    Brown asserts that she was misled by the prosecutor's affirmative representation to the trial court that the instructions correctly stated the law and that her acceptance of this representation constituted merely "affirmative acquiescence" to the instructions rather than an "affirmative representation" that they were correct. *See State v. Marquina*, 2018 UT App 219, ¶¶ 23–24, 437 P.3d 628, *cert. granted*, 440 P.3d 691 (Utah 2019). Because affirmative acquiescence has been rejected as a basis for invoking the invited error doctrine, Brown asserts that the doctrine cannot bar her plain error claims. *See id.* ¶ 23.

¶22    However, Brown did not merely acquiesce to the instructions, she affirmatively approved them. The trial court met with the prosecutor and Brown and went through each individual jury instruction to ensure that Brown understood and accepted them. Brown was even aware of a potential question as to the accuracy of the instructions' statement of the law due to the trial court's extensive questioning of the prosecutor regarding the instructions on willfulness. Yet rather than investigate the accuracy of the instructions or request that the court take further action to verify their accuracy, Brown explicitly affirmed her approval of each individual

jury instruction. Thus, her challenge to those instructions on appeal is barred by the invited error doctrine, and we do not consider it further.

B.     This Case Does Not Present the Type of Rare Circumstance That Would Justify Review Under the Exceptional Circumstances Exception to the Preservation Rule.

¶23     Brown alternatively argues that we should review her challenge to the jury instructions under the exceptional circumstances doctrine because "[t]he prosecutor's erroneous assertions about controlling case law, and the trial court's reliance on those statements," constituted a rare procedural anomaly that "'opened the door to exceptional circumstances' review." (Quoting *State v. Johnson*, 2017 UT 76, ¶ 36, 416 P.3d 443.)

¶24     Utah courts have applied the exceptional circumstances doctrine "sparingly, reserving it for the most unusual circumstances where our failure to consider an issue that was not properly preserved for appeal would have resulted in manifest injustice." *Johnson*, 2017 UT 76, ¶ 29 (quotation simplified). It is used to reach unpreserved issues "where a rare procedural anomaly has either prevented an appellant from preserving an issue or excuses a failure to do so." *Id.* (quotation simplified). This exception is not intended to be a "catch-all category" constituting "a free-floating justification for ignoring the legitimate concerns embodied in the preservation and waiver rules." *Id.* ¶ 38.

¶25     We do not agree with Brown that the prosecutor's allegedly erroneous statements to the trial court concerning the accuracy of the jury instructions rise to the level of a rare procedural anomaly. Brown's argument appears to assert that one party's misinterpretation or misapplication of the law is such an anomalous occurrence that it excuses the other party's obligation to object, investigate, or otherwise advocate for a

more correct interpretation or application. Misstatements of law, far from being a procedural anomaly, are an everyday occurrence in our adversarial system. Indeed, one of the main roles of a judge is to resolve differences in parties' interpretations of the law and to correct legal errors. A misstatement of law by one party, even if erroneously accepted by the trial court, does not generally work a manifest injustice on the other party such that the party is excused from complying with preservation rules.

¶26 Indeed, the anomaly in this case appears to be the fact that Brown elected to represent herself at trial rather than obtain counsel. Normally, it would fall to counsel to review the jury instructions and ensure that they accurately state the law. Had Brown been represented by counsel and had her counsel assented to the allegedly erroneous jury instructions, this case would likely be coming to us in the framework of an ineffective assistance of counsel claim. Unfortunately for Brown, as she represented herself, any error in affirming the accuracy of the instructions was her own.[1] And as a result of that error, we are unable to review Brown's unpreserved claims regarding the accuracy of the jury instructions.

## II. Expert Testimony

¶27 Brown next argues that the trial court plainly erred by permitting expert testimony from Allen that "offer[ed] an opinion on an ultimate issue to be decided by the jury" and in admitting the printouts. *See State v. Davis*, 2007 UT App 13, ¶ 15, 155 P.3d 909 (quotation simplified). Because Allen did not testify regarding legal conclusions and Brown invited any error in admitting the printouts, we reject Brown's arguments regarding the expert testimony.

---

1. As noted above, Brown elected to represent herself despite being "strongly urge[d]" by the court not to do so.

A. Brown Has Not Established That Allen's Testimony Was Impermissible Under the Utah Rules of Evidence.

¶28 Rule 702 of the Utah Rules of Evidence permits expert testimony if it "will help the trier of fact to understand the evidence or to determine a fact in issue." Utah R. Evid. 702(a). Such testimony is not rendered inadmissible purely on the basis that it offers an opinion on an "ultimate issue" to be decided by the jury. *See id.* R. 704(a). However, "opinions that tell the jury what result to reach or give legal conclusions [are] impermissible." *Davis*, 2007 UT App 13, ¶ 15 (quotation simplified). While there is "no bright line between responses that embrace an ultimate issue and those that provide an impermissible legal conclusion," *State v. Tenney*, 913 P.2d 750, 756 (Utah Ct. App. 1996), testimony is likely to constitute an impermissible legal conclusion if it is framed in a way that is unhelpful to the factfinder; "blur[s] the separate and distinct responsibilities of the judge, jury, and witness"; or creates a "danger that a juror may turn to the witness's legal conclusion rather than the judge for guidance on the applicable law," *Davis*, 2007 UT App 13, ¶ 15 (quotations simplified).

¶29 In *State v. Tenney*, 913 P.2d 750 (Utah Ct. App. 1996), this court determined that it was plain error for a trial court in a securities case to permit expert testimony that repeatedly and explicitly stated that various actions and omissions on the part of the defendant violated Utah law. *Id.* at 756. The court determined that "those portions of the expert witnesses' testimony to which defendant objects quite clearly state legal conclusions because the witnesses tie their opinions to the requirements of Utah law." *Id.*

¶30 On the other hand, in *State v. Larsen*, 865 P.2d 1355 (Utah 1993), our supreme court examined whether an expert's "occasional use of the term 'material'" during his testimony in a securities case constituted permissible testimony on an ultimate issue or an impermissible legal conclusion. *Id.* at 1361. The court determined that the trial court acted within its discretion in

admitting testimony regarding what actions and omissions "could have been important or significant to an investor" as "helpful to the jury," *id.*, and that the expert's "limited use" of the word "material," "under the circumstances, does not mandate the conclusion that he was improperly instructing the jury on the law," *id.* at 1362. Rather, the expert's statements were permissible ultimate issue testimony because the word "material" was used in its ordinary meaning to signify "something that an individual would want to know in making an important decision" rather than in its legal meaning under Utah law "defining what information must legally be disclosed." *Id.* The court explained that materiality was "at least on one level, a factual issue to be determined by the jury" rather than a legal conclusion. *Id.* at 1363. Because rule 704 permits expert testimony "regarding the ultimate resolution of that disputed issue as long as that testimony is otherwise admissible under the rules of evidence," the supreme court determined that the trial court did not err in admitting the expert testimony. *See id.*

¶31 The expert testimony in this case is much more similar to the testimony in *Larsen* than the testimony in *Tenney*. Allen made one general reference to "[t]he securities laws," stating that they "impose a requirement on issuers or sellers of securities, to provide full and fair disclosure." He then testified to how fraud is defined "in the [securities] industry," stating that sellers of securities need to "make sure [to] provide [investors] all material facts related to the investment," in other words, anything "that a reasonable investor would find important in deciding to purchase . . . or sell the security." Finally, he testified as to what types of information might be considered material and which specific facts in this case he would consider to be material to an investor.

¶32 Allen's one general reference to the disclosure requirements of "securities laws" could not reasonably be construed as a legal conclusion, because the information provided was general and not tied to a specific law. Further, unlike the experts in *Tenney*, who repeatedly referenced "Utah

law" and "the Act" specifically, Allen's general reference to "securities laws" occurred only one time in the course of his testimony. Similarly, his discussion of "fraud" and "materiality" was tied explicitly to the standard in the securities industry rather than represented as a legal definition of an element of a specific criminal statute. And as with the expert in *Larsen*, Allen's "occasional use of the term 'material'" during his testimony, *see id.* at 1361, was used in its ordinary meaning rather than its legal meaning and was helpful to the jury's determination of a factual matter at issue. Allen did not "testify that [Brown] was guilty" or that, "as a matter of law, the facts satisfied the legal standard of materiality." *See id.* at 1361 n.10. Thus, Brown cannot establish that it was error for the court to permit Allen to testify as he did, let alone plain error.

B.      Any Error in the Admission of the Printouts Was Invited.

¶33    Brown also asserts that it was plain error for the court to admit the two printouts because they were "outside [Allen's] area of expertise, irrelevant, and unhelpful" and therefore violated rules 403 and 703 of the Utah Rules of Evidence.

¶34    However, as with the jury instructions, Brown affirmatively approved the admission of both exhibits. She even used the printouts in her cross-examination of Allen. Thus, any error was invited. *See State v. Winfield*, 2006 UT 4, ¶ 14, 128 P.3d 1171.

CONCLUSION

¶35    Brown invited any error in the jury instructions by affirmatively approving them, and the circumstances of this case do not justify review of the jury instructions under the exceptional circumstances exception to the preservation rule. Additionally, Allen's testimony did not make impermissible legal conclusions, and its admission was therefore not erroneous.

Finally, any error in admitting the printouts was invited.[2] Accordingly, we affirm Brown's convictions.

——————

2. Because we have rejected each of Brown's claims of error, we also reject her cumulative error argument.