**2024 UT App 136**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BRANDON MACKINNON ZIMPFER,
Appellant.

Opinion
No. 20210841-CA
Filed September 19, 2024

Third District Court, Salt Lake Department
The Honorable L. Douglas Hogan
No. 201901951

Emily Adams, Hannah Leavitt-Howell, and Melissa
Jo Townsend, Attorneys for Appellant

Sean D. Reyes, Christopher A. Bates, and Andrew F.
Peterson, Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

LUTHY, Judge:

¶1 Brandon Mackinnon Zimpfer appeals from his conviction on charges of forcible sexual abuse and voyeurism. He argues that the trial court abused its discretion by admitting certain testimonial and documentary evidence and that his trial counsel (Counsel) rendered ineffective assistance by failing to seek the exclusion of certain video evidence and in not presenting expert testimony. We see no reversible error relating to the issues Zimpfer raises, and we therefore affirm.

BACKGROUND[1]

¶2    Zimpfer and Girlfriend first met toward the end of 2019, and they started dating in January 2020. At the time, Girlfriend was renting a room in a basement apartment in West Jordan, with her landlord (Landlord) living upstairs. Zimpfer soon started spending the night at Girlfriend's apartment, sometimes engaging in consensual sex with Girlfriend while there.

¶3    At one point in this timeframe, Zimpfer borrowed Girlfriend's car and got into "a fender bender." According to Zimpfer, Girlfriend was very upset about the damage to her car and frequently pestered Zimpfer about fixing the car.

¶4    Zimpfer stayed the night at Girlfriend's apartment on January 20, 2020. That evening, Girlfriend, who was about two months pregnant and struggling with sleep disorders, had trouble falling asleep, and Zimpfer gave her a pill to help her sleep, assuring her it was safe to take while pregnant. In the early morning hours of January 21, Zimpfer used Girlfriend's phone to take fourteen pictures, most of which showed Girlfriend lying in bed, fully clothed, and with her eyes closed.

¶5    Zimpfer also used the phone to record a nearly four-minute video of himself and Girlfriend. At the start of the video, Girlfriend appears to be sleeping, with Zimpfer's head resting on her stomach. At about twenty seconds into the video, Zimpfer moves Girlfriend's shirt to expose her breast and touches her nipple with his thumb. Girlfriend then rolls over and mumbles something inaudible. Zimpfer then asks her a question, to which

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Cruz*, 2020 UT App 157, n.1, 478 P.3d 631 (cleaned up), *cert. denied*, 481 P.3d 1040 (Utah 2021).

she mumbles a response. A few seconds later, Girlfriend begins snoring, and Zimpfer laughs and says she sounds "like a cricket."

¶6 Zimpfer can then be seen shaking his crotch and briefly exposing his partially erect penis. He then stands, repositions himself, and exposes his erect penis, putting it near and on Girlfriend's face. Girlfriend ultimately pushes Zimpfer away and mumbles something. Girlfriend continues snoring but also has another mumbled exchange with Zimpfer.

¶7 Zimpfer again lies down with his head on Girlfriend, and she resumes snoring. In the last thirty seconds of the video, Zimpfer pulls down Girlfriend's blanket, to which she responds by asking what he is doing. He answers that he is making a "homemade video." In response, Girlfriend mumbles something about her sleep schedule. The video then ends with Zimpfer commenting that he cannot figure out the password to Girlfriend's phone.

¶8 The following morning, Girlfriend left for an appointment and Zimpfer remained alone in her bedroom. At some point, he left the room to use the restroom and encountered Landlord. Landlord asked Zimpfer what he was doing at the apartment, and Zimpfer explained that he was "the boyfriend" and was "staying over." Landlord responded that Girlfriend was not allowed to have people staying overnight and that Zimpfer needed to pack his things and leave, which Zimpfer then did. Shortly thereafter, Girlfriend picked Zimpfer up and gave him a ride to his parents' house, where she and Zimpfer stayed that evening and overnight.

¶9 After returning to her apartment at some point the next day, January 22, Girlfriend broke up with Zimpfer. That same day, Zimpfer discovered that he could not find his anxiety medication and texted Girlfriend, asking her about the pills' disappearance, telling her, among other things, that he might have to "look at the camera photos" taken at his parents' house to figure out where the pills had gone, and stating, "If I can't find

them, . . . I have to file a police report to get my medication. You know how bad I am without it." Girlfriend responded that she had "absolutely no idea where[]" the pills were and said, "I encourage you to watch the videos, file a police report, and also find out."

¶10   It was not until the following day, January 23, that Girlfriend discovered the photos and the video on her phone that Zimpfer had taken on January 21. She contacted the West Jordan Police Department that day and filed a report. The report was forwarded to a detective in the special victims unit (Detective) to continue investigating. After an investigation, the State charged Zimpfer with forcible sexual abuse and voyeurism, and the case proceeded to trial.

*Opening Statements*

¶11   During her opening statement, the prosecutor told the jury that this was, "from the State's perspective, . . . a fairly simple case," and she described the video taken by Zimpfer, characterizing it as "the central piece of evidence" in the case. The prosecutor then briefly discussed other testimony the State would present and ended by reiterating the charges—specifying that the forcible sexual abuse charge was "for the touching of [Girlfriend's] breast while she was unconscious."

¶12   Counsel then addressed the jury, asserting that the case was not as simple as the prosecutor had suggested. Counsel asserted that the elements of the crime of voyeurism were not met because, among other things, the video was recorded with Girlfriend's knowledge and participation. Specifically, Counsel contended that Girlfriend unlocked her phone for Zimpfer prior to him making the video and that she was responsive and aware as the video was recorded. As proof of Girlfriend's awareness, Counsel twice referenced the portion of the video where Girlfriend pushed Zimpfer away when he put his erect penis on or near her face.

¶13    Counsel maintained that Girlfriend's assertion that she was unaware of the video until January 23 "doesn't make sense" and that her real reason for reporting the video to police was something other than her simple discovery of it on her phone. Counsel pointed out that Girlfriend was "already in a concerned state of mind," both because she could lose her housing from having an overnight guest and because she was worried about having money to fix her car that Zimpfer had damaged. Counsel contended that Zimpfer's accusation on January 22 that Girlfriend stole some of his pills was ultimately the driving force behind her decision to go to the police with the video, stating, "It's only when he says, you stole my pills and I'm going to the cops, that she thinks, what am I going to do about this? And the evidence is going to show you, she decided to beat him to it. She decided to go to the police first."

*Girlfriend's Testimony*

¶14    Girlfriend testified first, recounting the events of her short relationship with Zimpfer and her recollections of the night the video was created. Girlfriend explained that she had taken some prescription medications on the night of January 20 but that due to "huge sleeping disorders," she was struggling to sleep. She then related that Zimpfer had given her a pill to help her sleep and she had taken the pill and thereafter fallen asleep. The next thing she remembered was waking up the following morning.

¶15    Girlfriend testified that she had been keeping a journal during this period of time, and the prosecutor asked her about some of her journal entries. Counsel objected, arguing that the journal entries were not admissible as prior consistent statements because they did not "predate the motive to fabricate." The trial court overruled the objection, and the journal entries were admitted into evidence.

¶16    The journal entry for January 21—the same day the early-morning video was created—was admitted and read as follows:

"Ooh and dang it. My landlord kicked out [Zimpfer], yes, perfect timing. This shall dissipate as well." Girlfriend explained that she "was coming out of a very hard time in [her] life" and felt like she "couldn't stand up for [herself]" and kick Zimpfer out, and that she was "really relieved" when Landlord "stepped in" and did so.

¶17   Girlfriend testified that two days later, on January 23, she discovered the photos and video Zimpfer had taken on her phone. As to the photos, she said that she did not "remember the photos actually being taken" and did not give permission for the photos to be taken. As to the video—the entirety of which was played for the jury—Girlfriend said that when she first saw it she did not recognize it, was "shocked," and "didn't know how [it] could have happened." She testified that she had not given permission for the video to be recorded, that she had not consented to the touching that was shown in the video, and that she "believe[d] strongly" that her lack of memory of that night "was because of the pill that [Zimpfer] gave [her]."

¶18   The journal entry for January 23 was also admitted, and it read as follows: "Thursday, boy, I slept good. Wow, I was so tired. I just have work today, but just saw some photos on my phone. This is sickening, WTF, and then I saw a video, holy—what did he give me that night that made me—that made me go pass out like that? Called the [West Jordan] police, I knew something was off with him, always trying to get me to take the drugs. I'm pregnant. Help." Also on that journal page was a place to list things for which the writer is grateful, and on this day, Girlfriend had written "[t]he police and being okay."

*The Responding Officer's Testimony*

¶19   The State then presented the testimony of the officer who had, on January 23, responded to Girlfriend's call to the police. He testified that when he first saw Girlfriend, "she was very distressed, shaking pretty profusely, crying, her makeup was smeared, and she seemed pretty scared." He testified that

Girlfriend showed him the photos and video "of what had taken place" and that she accused Zimpfer of drugging her, stating, "The whole time that he was here, he kept offering me, you know, [anxiety medication] and all this stuff." The officer testified that he then referred the case to a detective.

*Detective's Testimony*

¶20 Detective testified regarding the investigation that followed Girlfriend's report. At the outset of Detective's testimony, after briefly explaining her qualifications and training, Detective described her actions upon being assigned to this case. She explained that she started by reviewing the photos and video taken by Zimpfer as well as the audio recording of the responding officer's interview with Girlfriend. This exchange between the prosecutor and Detective followed:

> Q. . . . So did reviewing this video help sort of direct the course of your investigation?
>
> A. Yes.
>
> Q. And how is that?
>
> A. In reviewing . . . the video, . . . it didn't appear as though [Girlfriend] was awake, and gave any type of consent for the actions that [Zimpfer] took.
>
> Q. And so as you viewed the video, and made the observations, what kind of things were you seeing that led you to believe that?

Counsel then objected, arguing that the jury members "can view the video themselves and come to their own conclusions." Although the trial court agreed with that assertion, it also determined that the prosecutor's question was "appropriate" and that Detective could "explain why she'[d] reached that

conclusion." Detective then responded, "When I reviewed it, I saw [Girlfriend], her eyes were closed, she didn't seem to be participating in what was happening. I heard her snoring. I heard [Zimpfer] make a comment about her snoring, that he heard her snoring. And that made me believe that she was asleep."

¶21 The prosecutor then specifically referenced the mumbled exchange between Girlfriend and Zimpfer toward the end of the video and asked if that exchange changed Detective's "original determination." Counsel again objected that Detective's assessment was "irrelevant" and that allowing such testimony "invad[es] the province of the jury." The trial court overruled the objection but paused the questioning to provide the following instruction to the jury:

> You may recall from the preliminary instructions, and you'll see in the final instructions when we get there, when it comes to the ultimate facts in the case, I'm just going to remind you that you're the finder of fact. Okay? You're going to hear—you'll hear testimony from lots of people. But ultimately, of the evidence that's been admitted to court, you're going to take that back in the jury room, and you're going to be the ones that have to decide what happened. What the facts are. Okay?
>
> So just bear in mind that, as you hear testimony, and as you hear evidence, that ultimately, you're the ones that have to make decisions about what the actual facts are in the case. Okay?

Questioning then resumed with the prosecutor restating the question about whether the exchange at the end of the video "[did] anything to dispel [Detective's] concerns from what [she] had previously viewed in the video," and Detective responding in the negative. The prosecutor then asked about the "next steps

in the investigation," and Detective discussed her subsequent investigative steps.

¶22   At the close of the State's case, Counsel moved for a mistrial based on the comments by Detective related to consent or, alternatively, for the court to give a curative instruction on "what is evidence and what is not evidence." Counsel also requested that the court strike Detective's comments related to consent. The court denied both the motion for a mistrial and the motion to strike, but it agreed to give a curative instruction regarding what is evidence and what is not evidence for the jury to consider.

*Zimpfer's Testimony*

¶23   Zimpfer testified in his defense. He explained that he has "a traumatic brain injury" that affects his short-term memory. He testified that due to this brain injury, he would not have been able to remember the security code on Girlfriend's phone and that she had entered the code and unlocked the phone for him right before he made the video on January 21.

¶24   As to the video, Zimpfer testified that Girlfriend was "[f]ully conscious" and "very aware" of what was going on during the video. He testified that the two "were fraternizing back and forth" during the video and that he thought Girlfriend "was joking around" when she could be heard snoring in the video. Additionally, Zimpfer said that immediately after the video concluded, Girlfriend "[s]pritely" got up and made him some food.

¶25   Zimpfer also discussed his encounter with Landlord on January 21. He related that not only did Landlord kick him out, but Landlord also indicated "that this was the last straw for [Girlfriend], that she'd be leaving too." Zimpfer testified that Girlfriend was "upset" when she learned of the encounter with Landlord and also that Girlfriend agreed, when the two were

speaking with Zimpfer's mother, "that she no longer had a place to stay" and that "she was kicked out." Zimpfer also testified that he and Girlfriend were on the same anxiety medication, that she was often taking some of his pills, and that he could not find his medication after she spent the night with him at his parents' house, prompting him to send her a text message asking where his pills were.

¶26 On cross-examination, the prosecutor demonstrated—by having Zimpfer "press a button that looks like a camera" on a locked phone similar to Girlfriend's—that the camera for taking pictures and video on such a device can be accessed without a passcode. Zimpfer responded, "That's cool. I did not know that." In response to questioning about the video, he reiterated that he and Girlfriend "had just been barely interacting" before the video, that Girlfriend was awake and alert during the recording of the video, and that he thought "she was faking" being asleep.

*Closing Statements*

¶27 At the close of trial, both sides presented closing arguments. The prosecutor asserted that "the critical facts" of the case were contained "on the video and in the photographs" and argued that they showed that Girlfriend did not consent: "The issue here is consent. Did [Girlfriend] actually consent? She said she did not consent to any of the 14 photos or the video that was taken. And you have the video of her actual conduct." The prosecutor reminded the jury that "[i]f [Girlfriend] was asleep, she did not consent" and then argued as follows:

> [Zimpfer] takes 14 photos that all show [Girlfriend] sleeping. Then he starts the video. He whispers as he talks to the camera. He comments that she's snoring, that she sounds like a cricket. He lays on her while she continues to snore. At the very end of the video, she mumbles something about, what is he doing? And he tells her that he's making

a home video. This is after he uncovers her, after he touches her breast, and after he places his penis on her face and mouth. So did he know she did not consent? All factors point to yes.

¶28 Counsel, in response, reminded the jury that "[i]t is never the defendant's burden to prove his innocence" and that "[t]he burden never leaves the State and the prosecutor to establish beyond a reasonable doubt the lack of consent." Counsel then argued that the State had failed to carry its burden as to consent, specifically pointing to evidence that Girlfriend unlocked the phone for Zimpfer and to the portion of the video where she asked Zimpfer what he was doing and he responded that he was making a video.

### Conviction and Appeal

¶29 The jury ultimately convicted Zimpfer on both charges— forcible sexual abuse and voyeurism. Zimpfer now appeals. Zimpfer has also filed with this court a motion under rule 23B of the Utah Rules of Appellate Procedure, arguing that Counsel rendered ineffective assistance when he failed to present expert testimony to establish "that [Zimpfer's] brain injury would have prevented him from memorizing the passcode to [Girlfriend's] phone," and requesting that we "remand this case to the district court for the entry of findings of fact necessary" to determine that issue.

## ISSUES AND STANDARDS OF REVIEW

¶30 Zimpfer first contends that the trial court improperly admitted Detective's testimony regarding consent. "The trial court has wide discretion in determining the admissibility of testimony, and such decisions are reviewed under an abuse of discretion standard. Under this standard, we will not reverse unless the decision exceeds the limits of reasonability." *State v.*

*Davis*, 2007 UT App 13, ¶ 7, 155 P.3d 909 (cleaned up); *see also Davidson v. Prince*, 813 P.2d 1225, 1230 (Utah Ct. App.) ("In reviewing the admissibility of evidence at trial, we give deference to the trial court's advantageous position, and do not overturn the result unless it is clear the trial court erred."), *cert. denied*, 826 P.2d 651 (Utah 1991).[2]

¶31 Next, Zimpfer argues that the trial court incorrectly allowed the State to submit Girlfriend's journal entries as prior consistent statements. Again, "the appropriate standard of review for a district court's decision to admit or exclude evidence is abuse of discretion." *State v. Green*, 2023 UT 10, ¶ 43, 532 P.3d 930 (cleaned up). "If the district court applies the correct legal standard, it abuses its discretion only when its decision to admit or exclude evidence is beyond the limits of reasonability." *Id.* (cleaned up).

¶32 Zimpfer additionally asserts that Counsel rendered ineffective assistance when he did not seek to prevent certain portions of the video from being shown to the jury. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Miller*, 2023 UT App 85, ¶ 22, 535 P.3d 390 (cleaned up), *cert. denied*, 540 P.3d 78 (Utah 2023).

---

2. Relatedly, Zimpfer asserts that the trial court erred in denying his motion to strike Detective's testimony and his motion for a mistrial based on Detective's testimony. Because these motions were based on his assertion that Detective's testimony was improper, and because we ultimately disagree with Zimpfer on this point, these additional arguments likewise fail, and we do not address them further.

¶33     In addition to the foregoing claims, we also address Zimpfer's rule 23B motion, in which he raises a second argument of ineffective assistance of counsel, this time challenging Counsel's failure to put on expert testimony regarding Zimpfer's memory limitations due to his brain injury. A rule 23B remand "will be available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." Utah R. App. P. 23B(a).

ANALYSIS

I. Detective's Testimony

¶34     Zimpfer challenges the trial court's decision to admit (1) Detective's testimony that when she first reviewed the video, "it didn't appear as though [Girlfriend] was awake, and gave any type of consent for the actions that [Zimpfer] took" and (2) Detective's subsequent response that the dialogue recorded near the end of the video did not "dispel [those initial] concerns."[3] Specifically, Zimpfer argues that with this testimony Detective impermissibly "answered the specific question the jury would later need to decide" and impermissibly "tied her own opinions to Utah law" because "here the legal and non-legal definitions of 'consent' are the same." We disagree with each assertion.

¶35     Under rule 704 of the Utah Rules of Evidence, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Utah R. Evid. 704(a). Notwithstanding this rule, "opinions that tell the jury what result to reach or give legal conclusions continue to

---

3. To the extent that the objection below could have preserved an evidentiary issue under rule 701(b) of the Utah Rules of Evidence as well, that issue has not been pursued on appeal, and we therefore do not address it.

be impermissible." *State v. Davis*, 2007 UT App 13, ¶ 15, 155 P.3d 909 (cleaned up).

> While there is no bright line between responses that embrace an ultimate issue and those that provide an impermissible legal conclusion, testimony is likely to constitute an impermissible legal conclusion if it is framed in a way that is unhelpful to the factfinder; blurs the separate and distinct responsibilities of the judge, jury, and witness; or creates a danger that a juror may turn to the witness's legal conclusion rather than the judge for guidance on the applicable law.

*State v. Brown*, 2019 UT App 122, ¶ 28, 447 P.3d 1250 (cleaned up), *cert. denied*, 456 P.3d 390 (Utah 2019); *see also Davis*, 2007 UT App 13, ¶¶ 15–16.

¶36    Despite the lack of a bright-line distinction, we have stated that witnesses "quite clearly" provide impermissible legal conclusions when they "tie their opinions to the requirements of Utah law." *State v. Tenney*, 913 P.2d 750, 756 (Utah Ct. App.), *cert. denied*, 923 P.2d 693 (Utah 1996); *see also Brown*, 2019 UT App 122, ¶ 32 ("[The witness's] one general reference to the disclosure requirements of 'securities laws' could not reasonably be construed as a legal conclusion, because the information provided was general and not tied to a specific law."); *Davis*, 2007 UT App 13, ¶¶ 14, 17 (stating that a witness inappropriately rendered a legal conclusion because he "applied the facts of the case to the prohibitions in the statute" by testifying as to his "understanding of the statute" that the defendant's fingerprints "obviously meant he handled the firearm and that possession [of a firearm] is to hold and to have it in your hands under your control" (cleaned up)); *State v. Bryant*, 965 P.2d 539, 548 (Utah Ct. App. 1998) (holding that witness testimony was properly allowed where "the prosecutor did not ask the [witness] to opine as to whether the facts of [the]

case met the legal definition of robbery, nor [could] her testimony reasonably be understood that way").

¶37 Similarly, we have concluded that opinion testimony was impermissible when it "was an answer to a specific question which would appear on the verdict form." *Davidson v. Prince*, 813 P.2d 1225, 1231 (Utah Ct. App.), *cert. denied*, 826 P.2d 651 (Utah 1991); *see also Steffensen v. Smith's Mgmt. Corp.*, 862 P.2d 1342, 1348 (Utah 1993) (affirming the trial court's exclusion of witness testimony that would "allocate the actual percentage of negligence between" two arguably negligent parties, reasoning that "apportionment of negligence . . . was exclusively the jury's responsibility"); *Davis*, 2007 UT App 13, ¶ 17; *Davidson*, 813 P.2d at 1231–32 (determining that witness testimony expressing a "final conclusion that [the defendant] was negligent" was properly excluded, but also basing this determination, in part, on the fact that the witness *was* "allowed to give his opinion as to . . . the reason [the defendant's] truck overturned while going around a curve, that the truck was traveling too fast for the curve, what the speed limit was at the curve, whether a person hauling livestock should be concerned with his load and what the concerns should be, and whether a person hauling livestock could foresee the possibility of injury if the truck overturned").

¶38 On the other hand, when witnesses have used a term "in its ordinary meaning rather than its legal meaning," we have determined that their testimony was appropriately admitted. *Brown*, 2019 UT App 122, ¶ 32; *see also State v. Larsen*, 865 P.2d 1355, 1362 (Utah 1993) ("Given that 'materiality' has a popular meaning bearing directly on the factual issue before the jury and that [the witness's] testimony, when read in context, seems to use 'material' as a synonym for 'important,' we do not believe that the trial court abused its discretion by admitting [the] testimony."); *Brown*, 2019 UT App 122, ¶ 32 (allowing a witness's testimony where the "occasional use of the term 'material' during his testimony was used in its ordinary meaning rather than its legal

meaning" (cleaned up)); *Bryant*, 965 P.2d at 548 ("Here, the victim's casual use of the word, 'robbery,' was factual, not legal. Thus, the trial court did not err in allowing her testimony.").

¶39 The testimony at issue here was elicited toward the beginning of the prosecutor's examination of Detective. After asking Detective about her training and qualifications, the prosecutor walked Detective through the steps of her investigation. The prosecutor initially asked Detective what she did "when [she] first kind of dug into the case." Detective replied that she commenced by reviewing the initial report, the video, the photographs, and the audio recording of Girlfriend's police interview. After a few follow-up questions clarifying that the video and photographs Detective was referencing were those in evidence in the case, the prosecutor continued to walk Detective through her investigative process, asking, "Okay. So did reviewing this video help sort of direct the course of your investigation?" Detective answered in the affirmative and then explained, "In reviewing . . . the video, . . . it didn't appear as though [Girlfriend] was awake, and gave any type of consent for the actions that [Zimpfer] took."

¶40 This first comment to which Zimpfer objected—the only one in which Detective used the word "consent"—was in response to questions about what "direct[ed] the course of [Detective's] investigation." And the comment was clearly couched in terms of what the video "appear[ed]" to show upon an initial viewing, prior to any investigation; Detective did not testify that those initial appearances were borne out by the subsequent investigation. That is, in context, with this first comment, Detective was not concluding definitively that Zimpfer acted without Girlfriend's consent, just that the video raised enough of a question to merit further investigation.

¶41 Furthermore, in this first comment, Detective made no mention of the law, let alone suggested to the jury that the facts

here ultimately satisfy the "without consent" elements at issue. *See generally* Utah Code § 76-5-406(2); *id.* § 76-9-702.7(1)(b). In fact, Detective's initial assessment was not inconsistent with the defense's theory of the case, that is, that Girlfriend "was joking around" by snoring and pretending to be asleep in the video but that her actions before the video started (entering her phone passcode for Zimpfer) and after the video ended (jumping up to go make food) show the real story, which is that Girlfriend was "very aware" during the video. Thus, the jury could have been entirely in agreement with Detective's testimony as to the initial impression conveyed by the video and nonetheless acquitted based on believing Zimpfer's fuller explanation of the events.

¶42 The second statement to which Zimpfer objected—in which Detective did not use the word "consent"—was Detective's response to a follow-up question regarding the short exchange between Zimpfer and Girlfriend at the end of the video and whether that exchange "[did] anything to dispel [Detective's] concerns" about what she had seen in the video. Thus, this statement, too, was regarding Detective's initial assessment and did not convey an ultimate conclusion. Nor with this statement did Detective fashion any sort of tie to Utah law or suggest that any statutory element of the alleged crimes was satisfied in this case. Therefore, this statement also did not rise to the level of an impermissible legal conclusion.

¶43 Zimpfer argues that Detective's testimony regarding consent "indicat[ed] that the jury needed to be looking for some affirmative action indicating [Girlfriend] consented" and, thus, did not "follow[] the statutory scheme," which required the State to prove that Zimpfer's conduct was "without consent." *See generally id.* § 76-5-404(2)(a) (defining forcible sexual abuse as a qualifying act that is done "without the consent" of the victim); *id.* § 76-9-702.7 (defining voyeurism as a qualifying act that is done "without the knowledge or consent" of the victim). But the fact that Detective's testimony was inconsistent with the statute's

usage of "without consent" actually *supports* the conclusion that Detective was not tying her testimony to any particular law but was simply using the ordinary, colloquial meaning of "consent."

¶44 Additionally, although Zimpfer asserts that the legal and non-legal definitions of consent are the same in this case, that is not entirely accurate. The jury instruction defining "consent" listed several scenarios in which "[t]he alleged sexual conduct [would be] without consent," including the following: if Girlfriend was "coerced . . . to submit" by threat of retaliation, if Girlfriend was incapable of "understanding the nature of the act" due to a mental illness or defect, if Zimpfer knew Girlfriend participated because she mistakenly thought he was someone else, or if Zimpfer "intentionally impaired [Girlfriend's] power to understand or control [her] conduct by giving [her] a substance without [her] knowledge." *See id.* § 76-5-406(2) (listing various circumstances under which a sexual act "is without consent of the victim"). Thus, even though one could say in these hypothetical situations that Girlfriend had agreed to be a participant in the sexual conduct—thus meeting the ordinary meaning of "consent," *see Consent*, Merriam-Webster, https://www.merriam-webster.com/dictionary/consent [https://perma.cc/TS8E-WMBF] (defining "consent" as "to give assent or approval: AGREE")—that agreement would not have satisfied the legal definition and would legally be "without consent." Of course, Zimpfer is correct that the instruction went on to state, "You may *also* apply the common, ordinary meaning of consent to all of the facts and circumstances of this case." (Emphasis added.) But because there is no exact overlap between the legal and colloquial definitions of consent, and because Detective's testimony was completely divorced from any reference to statutory requirements and her one use of the word "consent" could have easily been replaced with the non-legal synonym "agree," we conclude that the fact that the legal meaning of consent includes its colloquial meaning did not make Detective's testimony at issue per se inadmissible.

¶45    In sum, Detective's single use of the word "consent" when describing the impetus for her further investigation, as well as her clarification that the dialogue at the end of the video did not dispel her initial concerns, did not "tell the jury what result to reach or give legal conclusions." *State v. Davis*, 2007 UT App 13, ¶ 15, 155 P.3d 909 (cleaned up). The trial court therefore did not abuse its discretion in allowing such testimony.

## II. Girlfriend's Journal Entries

¶46    Zimpfer next argues that the trial court improperly admitted two of Girlfriend's journal entries as prior consistent statements.[4] We disagree.

¶47    Under rule 801 of the Utah Rules of Evidence, the definition of hearsay encompasses written statements that are "offer[ed] in evidence to prove the truth of the matter asserted in the statement." Utah R. Evid. 801(c); *see also id.* R. 801(a) (including a "written assertion" within the definition of "[s]tatement"). But this rule also excludes from the definition of hearsay certain prior statements of a witness. *See id.* R. 801(d)(1). To avoid qualifying as hearsay, the prior statement must be "consistent with the [witness's] testimony" and "offered to rebut an express or implied

---

4. The prosecutor's initial justification for the admission of the journal entries was that they were prior consistent statements, but she also argued that the journal entries were admissible as recorded recollections. *See generally* Utah R. Evid. 803(5) (setting forth the recorded recollection exception to the rule against hearsay). From the discussion that followed Zimpfer's objection, it appears that the trial court's admissibility determination was based entirely on the journal entries qualifying as prior consistent statements, and the State concedes on appeal that the recorded recollection exception does not apply to the journal entries. We therefore do not discuss further this potential alternative justification for the entries' admission.

charge that the [witness] recently fabricated it or acted from a recent improper influence or motive in so testifying." *Id.* R. 801(d)(1)(B). Thus, the statement must have been "made before the charged recent fabrication or improper influence or motive." *State v. Bujan*, 2008 UT 47, ¶ 8, 190 P.3d 1255 (cleaned up). Against this legal backdrop, we now address each journal entry in turn.

A.     The January 21 Journal Entry

¶48     The trial court ruled that the January 21 journal entry—the one in which Girlfriend wrote that Landlord's "kick[ing] [Zimpfer] out" was "perfect timing" because Girlfriend "couldn't stand up for [herself]" and was "really relieved" when Landlord "stepped in"—was a non-hearsay prior consistent statement and could be properly admitted. Zimpfer contests this ruling, arguing that the State offered both journal entries "for an improper purpose" and that the January 21 journal entry was written "*after* the motive to fabricate arose.*"

¶49     Zimpfer's argument that the State offered the journal entries for an improper purpose is based entirely on the timing of the State's introduction of the journal entries. He essentially contends that because the journal entries were admitted during the prosecutor's direct examination of Girlfriend, as opposed to after she had been cross-examined by Counsel, "the only possible purpose of the entries at that point was to boost [Girlfriend's] credibility."

¶50     The assertion underlying this argument—that a charge of recent fabrication made during opening statements, as opposed to during the presentation of evidence, is insufficient to justify the admission of a prior consistent statement under rule 801—is one that we decline to address. We see no similar assertion below that would have brought this issue to the attention of the trial court, *see State v. Sanchez*, 2018 UT 31, ¶ 30, 422 P.3d 866 ("In order to preserve an issue for appeal the issue must be presented to the trial court in such a way that the trial court has an opportunity to

rule on that issue. To meet [this] preservation requirement, the issue must be sufficiently raised to a level of consciousness before the trial court and must be supported by evidence or relevant legal authority." (cleaned up)), and on appeal this assertion was neither directly expressed nor supported with any authority until Zimpfer's reply brief, leaving the State no opportunity to respond to it, *see Brown v. Glover*, 2000 UT 89, ¶ 23, 16 P.3d 540 ("Generally, issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court. This is to prevent the resulting unfairness to the respondent if an argument or issue was first raised in the reply brief and the respondent had no opportunity to respond." (citation omitted)). Thus, we consider this argument waived and decline to overturn the trial court's ruling on this basis.[5]

¶51 As to his argument regarding the timing of the journal entry in relation to the emergence of a motive to fabricate, Zimpfer

---

5. In his argument on this point, Zimpfer also suggests that a prior consistent statement may be considered only for its rehabilitative purpose and not for its substance. Zimpfer is correct that our supreme court has stated that the *purpose* of excluding prior consistent statements from the definition of hearsay is "to admit statements that rebut a charge of recent fabrication or improper influence or motive, not to bolster the believability of a statement already uttered at trial." *State v. Bujan*, 2008 UT 47, ¶ 11, 190 P.3d 1255. But the supreme court has also stated that "premotive, consistent, out-of-court statements are . . . admitted *both* for rehabilitative purposes and, more importantly to the purpose of the rule, for their substance." *Id.* (emphasis added). Thus, a jury may properly consider such statements for more than just their rehabilitative purpose. *See id.; see also id.* ¶ 9 (contrasting evidence admissible under the common law for only its rehabilitative purpose and evidence admitted "substantively under rule 801(d)(1)(B)").

asserts that his accident while driving Girlfriend's car and his actions that placed Girlfriend's housing in jeopardy created motives for Girlfriend to fabricate and that they both predated the journal entry. This argument is unavailing.

¶52 First, we agree with the State that neither of these incidents was specifically raised by Counsel below as a potential motive for fabrication. In his opening statement, Counsel did mention Girlfriend's housing concerns and her damaged car, remarking, "And because of that, she's already in a concerned state of mind . . . ." But Counsel went on to discuss Zimpfer's missing pills and that he had accused Girlfriend of taking the pills and threatened to make a police report. Counsel then asserted, "It's only when he says, you stole my pills and I'm going to the cops, that she thinks, what am I going to do about this? And the evidence is going to show you, she decided to beat him to it. She decided to go to the police first." Then when Counsel objected to the journal entries at trial, the only potential motive to fabricate that he identified was Zimpfer's threat to go to the police about his missing pills.

¶53 Nonetheless, regardless of whether the two additional motives to fabricate were adequately argued below, Zimpfer's argument on this point ultimately fails because it is clear that the January 21 journal entry was recorded before *some* alleged motive to fabricate arose. Recently, in *State v. Green*, 2023 UT 10, 532 P.3d 930, our supreme court specifically rejected the argument that "for a prior consistent statement to be admissible under rule 801, it must have been given before *any* potential motive to fabricate arose." *Id.* ¶¶ 86–87. The court instead concluded, "It is not necessary that a prior consistent statement have been made before *all* motives to fabricate arose. The rule requires merely that the witness' prior consistent statement be offered to rebut *an* express or implied charge against him of recent fabrication or improper influence or motive." *Id.* ¶ 100 (cleaned up). Thus, because the January 21 journal entry was written before one of the motives to fabricate—the motive arising from Zimpfer's January 22 threat to

contact the police about his missing pills—it meets the requirements of a prior consistent statement under rule 801.

B.      The January 23 Journal Entry

¶54    The journal entry for January 23 was also admitted, and it read as follows: "Thursday, boy, I slept good. Wow, I was so tired. I just have work today, but just saw some photos on my phone. This is sickening, WTF, and then I saw a video, holy—what did he give me that night that made me—that made me go pass out like that? Called the [West Jordan] police, I knew something was off with him, always trying to get me to take the drugs. I'm pregnant. Help." Also on that journal page was a place to list things for which the writer is grateful, and on this day Girlfriend had written "[t]he police and being okay."

¶55    The trial court admitted the January 23 journal entry as another prior consistent statement. But because this journal entry was made after all alleged motives to fabricate arose, it does not qualify as a prior consistent statement under rule 801, and it was an abuse of discretion for the court to have admitted it as such. *See State v. Green*, 2023 UT 10, ¶ 100, 532 P.3d 930. The State apparently concedes this point, arguing on appeal that this second journal entry was admissible, instead, under the excited utterance exception to the rule against hearsay. *See generally Bailey v. Bayles*, 2002 UT 58, ¶ 10, 52 P.3d 1158 ("It is well settled that an appellate court may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record, even though such ground or theory differs from that stated by the trial court to be the basis of its ruling or action, and this is true even though such ground or theory is not urged or argued on appeal by appellee, was not raised in the lower court, and was not considered or passed on by the lower court." (cleaned up)).

¶56    For a statement to qualify under the excited utterance exception to the rule against hearsay, the statement must be "relating to a startling event or condition" and must have been

"made while the declarant was under the stress of excitement that it caused." Utah R. Evid. 803(2); *see also West Valley City v. Hutto*, 2000 UT App 188, ¶ 15, 5 P.3d 1 ("Hearsay statements fall within the excited utterance exception when (1) a startling event or condition occurred, (2) the statement was made while the declarant was under the stress of excitement caused by the event or condition, and (3) the statement relates to the startling event or condition." (cleaned up)). "The reasoning [behind the exception] is simple: the stress and excitement of the event suppress the declarant's ability to reflect or calculate self interest in a manner that would produce a lie." *Hutto*, 2000 UT App 188, ¶ 12. Thus, this exception is narrow and "limited to truly spontaneous outbursts" as opposed to "the ongoing discourse of an excited individual." *Id.* ¶ 14 (cleaned up). For this exception to apply, "the declarant has to have 'remained' under the original, uninterrupted, and unsubsided stress of the startling event when making the statements." *Id.* ¶ 15 (cleaned up).

¶57 Even assuming we were to agree with the State that the discovery of the video was a startling event to which the journal entry related, we agree with Zimpfer that it is not clear from the record that Girlfriend made the journal entry while she was still under the stress caused by that discovery. The State points to the journal entry itself and its statement that Girlfriend "just saw some photos on [her] phone." But along with this mention of discovering the photos and video on her phone, the journal entry also stated that Girlfriend had "called the [West Jordan] police," thus indicating a passage of some time between the discovery of the video and the creation of the journal entry. It is therefore not apparent from the record that the January 23 journal entry was a "truly spontaneous outburst," *id.* ¶ 14 (cleaned up), made while Girlfriend "remained" under the original stress of the arguably startling event of the discovery of the video, *id.* ¶ 15 (cleaned up). Consequently, on this record, we cannot affirm the court's decision to admit the journal entry based on the excited utterance exception.

¶58 However, while we agree with Zimpfer that the admission of the second journal entry was an abuse of discretion, we ultimately determine that this error was harmless. "An error is harmless and does not require reversal if it is sufficiently inconsequential that we conclude there is no reasonable likelihood that the error affected the outcome of the proceedings. Stated differently, the likelihood of a different outcome absent the error must be sufficiently high to undermine confidence in the verdict." *State v. Reece*, 2015 UT 45, ¶ 33, 349 P.3d 712 (cleaned up).

¶59 The improperly admitted journal entry was, as it clearly states, written after Girlfriend made her report to the police. And the officer who responded to Girlfriend's report testified that on January 23 Girlfriend "was very distressed, shaking pretty profusely, crying, her makeup was smeared, and she seemed pretty scared" and accused Zimpfer of drugging her. In other words, the jury received other admissible evidence that conveyed the same information contained in the January 23 journal entry—that upon discovering the photos and video on her phone, Girlfriend was upset and suspected that Zimpfer had drugged her. Because the January 23 journal entry is, therefore, largely cumulative of other admissible evidence, we are not convinced that there is a reasonable probability of a different outcome had the January 23 journal entry not been admitted.[6] *Cf. State v. Jones*,

---

6. We disagree with Zimpfer's assertion that this case was essentially a "credibility contest" because "[n]o one except [Zimpfer] and [Girlfriend] were in the room during the video," and with his related assertion that "'the State's case depends virtually exclusively on the credibility of a witness.'" (Quoting *McCray v. State*, 716 A.2d 302, 308 (Md. Ct. Spec. App. 1998).) These assertions aim to amplify the importance of the journal entries' potential to influence the jury's view of Girlfriend's credibility. But they completely overlook the non-testimonial evidence of the video itself and, thus, exaggerate the significance of the credibility issues before the jury.

2020 UT App 31, ¶ 35, 462 P.3d 372 ("[W]here testimony is merely cumulative, we are disinclined to find prejudice even when the testimony was improperly admitted."). Thus, the error in its admission is harmless, and we will not disturb the jury's verdict on this basis.

## III. The Video Evidence

¶60 Zimpfer argues that Counsel provided ineffective assistance by not seeking to exclude a portion of the video, specifically the forty-five-second portion in which he exposes his penis and puts it in Girlfriend's face, and she pushes him away. Zimpfer argues that this conduct "was more prejudicial than probative and should have been excluded from trial" under rule 403 of the Utah Rules of Evidence. *See* Utah R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . .").

¶61 "To prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that (1) 'counsel's performance was deficient' and (2) 'the deficient performance prejudiced the defense.'" *State v. Miller*, 2023 UT App 85, ¶ 25, 535 P.3d 390 (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)), *cert. denied*, 540 P.3d 78 (Utah 2023). The first element of the test requires "show[ing] that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The second element of the test "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. "A defendant's inability to establish either element defeats a claim for ineffective assistance of counsel." *Miller*, 2023 UT App 85, ¶ 25 (cleaned up). Here, Zimpfer has failed to establish the first element.

¶62 Our deficient performance assessment "must be highly deferential." *Strickland*, 466 U.S. at 689. We "must indulge a strong presumption that counsel's conduct falls within the wide range of

reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (cleaned up). "If it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance." *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871. Such is the situation before us.

¶63 Counsel did not simply acquiesce to the State's use of this portion of the video. Instead, Counsel himself relied on the video to support the defense's theory of the case. Twice in Counsel's opening statement, he referenced this very part of the video, arguing that Girlfriend pushing Zimpfer away showed that she was aware of and responsive to what was happening during the video, that is, that she was not actually asleep as it might have, in some respects, appeared. And in closing argument, Counsel continued to rely on an argument that Girlfriend was "aware" in the video.

¶64 Zimpfer responds that such a strategy was not reasonable because the charged conduct of touching Girlfriend's breast occurred earlier in the video and that "[w]hether [Girlfriend] was awake and pushed away [Zimpfer's] penis accordingly does not bear on whether she was awake at the time he touched her breast." But Counsel argued that Girlfriend was awake during the whole video—having entered her passcode before the video started and jumping up after the video ended to go make food. Therefore, any actions within the video that would suggest that Girlfriend was alert and responsive would have supported that theory.

¶65 We acknowledge that it might also have been a reasonable trial strategy for Counsel to forgo using the contested portion of the video and, instead, to seek to have it excluded under rule 403. But the existence of another reasonable trial strategy does not establish deficient performance. In reality, "[t]here are countless

ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689.

¶66    Ultimately, we have no trouble determining that the trial strategy Counsel chose to employ "falls within the wide range of reasonable professional assistance" and that Zimpfer has not established deficient performance with regard to this issue. Therefore, Zimpfer's ineffective assistance argument fails.

## IV. Expert Testimony

¶67    Finally, we address Zimpfer's rule 23B motion, which argues that Counsel also rendered ineffective assistance by failing to "investigate or call expert witnesses who could have testified that [Zimpfer's] brain injury would have prevented him from memorizing the passcode to [Girlfriend's] phone and that he would have had trouble even recalling the code long enough to input the code if [Girlfriend] had told it to him." Remand under rule 23B is available only when the facts alleged in the motion, "if true, could support a determination that counsel was ineffective." Utah R. App. P. 23B(a). Thus, we will not remand a case if the alleged facts, if true, would fail to establish either counsel's deficient performance or a prejudicial impact resulting therefrom. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984) (setting forth the elements of the ineffective assistance test). Here, the facts alleged in Zimpfer's motion, even if true, do not establish that Counsel performed deficiently in failing to investigate further and call expert witnesses to testify about Zimpfer's brain injury.

¶68    First, we note that Zimpfer himself testified as to his brain injury and its relevant effects. He testified that his "traumatic brain injury" affected his short-term memory, which means he "cannot remember . . . numbers" and that security codes are "really difficult" for him. Thus, the evidence that Zimpfer argues should have been presented by experts was placed before the jury through other means, lessening the importance of the expert

testimony. *See State v. Walker*, 2010 UT App 157, ¶ 16, 235 P.3d 766 (determining that certain expert testimony "was not critical because the defense was able to address [the issue] by cross-examining the State's lay witnesses"), *cert. denied*, 241 P.3d 771 (Utah 2010).

¶69 Second, we do not agree with Zimpfer's suggestion that expert testimony regarding his brain injury was nonetheless "critical to the case" (quoting *State v. Hales*, 2007 UT 14, ¶ 79, 152 P.3d 321), because it did not go to a contested issue. Zimpfer's testimony about his brain injury was given to support his assertion that Girlfriend entered the passcode for her phone before Zimpfer started recording. But the prosecutor challenged Zimpfer's testimony not by casting doubt on the existence of a brain injury or the purported severity of its effects, but by demonstrating that a video can be made on a passcode-protected phone like Girlfriend's without anyone entering the passcode at all—by simply pressing the camera icon on the screen of the locked phone. Thus, the point at issue was not whether Zimpfer suffered from a brain injury and how extensive the impact of that injury was but, rather, whether he had made the video without the passcode having been entered at all. Consequently, reasonable counsel could have determined that expert testimony on the matter of the brain injury was simply not necessary.

¶70 Of course, expert testimony verifying Zimpfer's assertions regarding his brain injury might have had some marginal beneficial effect on Zimpfer's credibility, but that alone does not establish that Counsel performed deficiently by failing to present it. *See State v. Houston*, 2015 UT 40, ¶ 82, 353 P.3d 55 (concluding that although certain expert testimony "may have been helpful" to the defense, it "was not required" and counsel "certainly was not ineffective for . . . [failing] to retain an expert on [the] topic"); *State v. Tyler*, 850 P.2d 1250, 1256 (Utah 1993) ("[C]ounsel's decision to call or not to call an expert witness is a matter of trial strategy, which will not be questioned and viewed as

ineffectiveness unless there is no reasonable basis for that decision."). Under these circumstances, where Zimpfer testified regarding his brain injury and that testimony was not challenged by the State, the decision to forgo expert testimony on the matter did not fall "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Thus, the facts alleged in Zimpfer's rule 23B motion do not "support a determination that counsel was ineffective," Utah R. App. P. 23B(a), and we accordingly deny the motion.

## CONCLUSION

¶71     The trial court did not abuse its discretion in admitting Detective's testimony or Girlfriend's January 21 journal entry. Although admission of her January 23 journal entry was an abuse of discretion, we determine that the error in this regard was harmless. Finally, Zimpfer's claims of ineffective assistance fail because Counsel did not perform deficiently in failing to seek exclusion of a portion of the video or in failing to present expert testimony regarding Zimpfer's brain injury. Accordingly, we affirm.

———————